[No. A102026. First Dist., Div. Two. Sept. 9, 2004.]

CITY AND COUNTY OF SAN FRANCISCO, Plaintiff and Appellant, v. FLYING DUTCHMAN PARK, INC. et al., Defendants and Appellants.

76

## Counsel

Dennis J. Herrera, City Attorney, Julie Van Nostern, Chief Tax Attorney, and Ellen Forman, Chief Appellate Attorney, for Plaintiff and Appellant.

Law Offices of J. Brian McCauley and J. Brian McCauley for Defendants and Appellants.

## Opinion

### RUVOLO, J.—

### I.

#### Introduction

Respondent and cross-appellant Flying Dutchman Park, Inc. (Flying Dutchman) provides commercial parking and valet parking services alleged by appellant and cross-respondent City and County of San Francisco (CCSF) to be subject to its parking tax (S.F. Mun. Code, §§ 601–615).[1] The parking tax imposes a tax of 25 percent (§§ 602, 602.5) on "rent" paid for "occupancy" of a space for parking a motor vehicle in a "parking station" (§§ 601, 602A).

CCSF's appeal arises out of a successful defense by Flying Dutchman to an enforcement action brought by CCSF to collect in excess of $800,000 in parking tax arrearages. The trial court agreed with Flying Dutchman's contention that the parking tax was unconstitutional as violating the state's guarantee of equal protection (Cal. Const., art. I, § 7, subd. (a)) because CCSF had no rational basis for subjecting Flying Dutchman to the parking tax requirements, while exempting certain other groups. We conclude that there exist rational bases for the exemptions allowed in the parking tax ordinance, and, therefore, its enforcement against Flying Dutchman does not violate equal protection. Accordingly, the trial court erred in ruling to the contrary.

Nevertheless, we agree with the trial court that, under the express provisions of the parking tax ordinance, Flying Dutchman is not liable for any tax unless, with respect to each transaction sought to be taxed, CCSF proves that

---

[1] All undesignated article and section references are to excerpts from the version included in the record before us of article 9 of part III of the Business and Tax Regulations Code, which is part of the City and County of San Francisco Municipal Code.

rent was paid. Consequently, the trial court properly reduced Flying Dutchman's parking tax arrearages to eliminate amounts derived from Flying Dutchman's valet parking activities where no fee was paid by Flying Dutchman for space used to park vehicles.

As to Flying Dutchman's cross-appeal, we conclude that the parking tax does not: (1) violate the state Constitution's privileges and immunities clause (Cal. Const., art. I, § 7, subd. (b)), or (2) amount to an improper double tax on real estate in violation of the state Constitution (Cal. Const., art. XIII, § 1). Moreover, we agree with the trial court that the portion of the parking tax earmarked for senior citizens' activities is void as a "special tax," which did not receive the requisite two-thirds approval by the voters as required by relevant provisions of the California Constitution (art. XIII A, § 4). However, that illegal allocation does not require invalidation of the entire parking tax ordinance or reduction of Flying Dutchman's parking tax arrearages, because the offending clause is severable under the ordinance's savings clause, thereby allowing parking tax revenue to pass exclusively into CCSF's general fund.

## II.

### PROCEDURAL BACKGROUND

This is the second action concerning whether CCSF's municipal parking tax is constitutionally valid. The first was filed by Flying Dutchman and sought declaratory and injunctive relief preventing CCSF from enforcing the parking tax law. In *Flying Dutchman Park, Inc. v. City and County of San Francisco* (2001) 93 Cal.App.4th 1129 [113 Cal.Rptr.2d 690] (*Flying Dutchman I*), we affirmed the judgment entered in favor of CCSF after the trial court sustained its demurrer to Flying Dutchman's complaint. However, we affirmed only on the procedural ground that governing law required Flying Dutchman first to pay the disputed tax before becoming legally eligible to file an action contesting that tax. Because Flying Dutchman had not done so, judgment was properly entered in favor of CCSF.

On May 16, 2001, while *Flying Dutchman I* was pending, CCSF filed its own action in San Francisco Superior Court seeking to recover unpaid parking taxes from Flying Dutchman, and certain individuals under claims of alter ego. The amounts allegedly owed were the subject of a first amended complaint (FAC), which sought to recover a total of $451,848 in tax, $90,370 in tax penalties, and $344,783 in interest.[2] Flying Dutchman asserted 24

---

[2] No determination was made below as to the claims against the individually named defendants based on alter ego grounds, and the issue was deemed moot based on the trial court's ruling invalidating the parking tax on equal protection grounds. Accordingly, we do not

affirmative defenses, including the four involved in this appeal and cross-appeal: (1) violation of equal protection (Third and Fourth Affirmative Defenses), (2) violations of the privileges and immunities clause of the state constitution (Eighth and Ninth Affirmative Defenses), (3) invalid double taxation of real property (Second Affirmative Defense), and (4) violation of Proposition 13 (Fifteenth Affirmative Defense).

Evidence was thereafter presented to the court sitting without a jury in June 2002. After submission of the evidence, the parties presented briefs, including supplemental briefs, on the disputed legal issues. The trial court issued its 18-page statement of decision on December 19, 2002, and judgment was entered on February 18, 2003. As noted, both sides have appealed.

## III.

### DISCUSSION

### A. Equal Protection Claim

CCSF's parking tax was enacted in the early 1970's, and remains codified in sections 601–615 of article 9, part III of the San Francisco Municipal Code. Quite succinctly, section 602 provides: "Subject to the provisions of this Article, there is hereby imposed a tax of 15 percent for the rent of every occupancy of parking space in a parking station in the City and County. . . ."[3]

As noted, Flying Dutchman claims the parking ordinance violates the equal protection clause of the California Constitution (art. I, § 7, subd. (a)), both facially (Third Affirmative Defense), and as applied (Fourth Affirmative Defense), because there exists no rational basis for exempting certain parking activities while making Flying Dutchman potentially liable for the parking tax on its activities.[4]

The parking tax exempts revenues derived from: (1) parking by registered hotel guests or apartment residents in parking stations or facilities that are

---

address the individual defendants' potential liability for the taxes owed. Also, although all respondents join in opposing CCSF's appeal, and in pursuing Flying Dutchman's cross-appeal, for simplicity's sake we refer to respondents and cross-appellants collectively as "Flying Dutchman."

[3] The tax was originally set at 15 percent of parking "rent" (§ 602), but was later raised to 25 percent when a surcharge of 10 percent was added (§ 602.5). "Rent," "Parking Station," "Occupant," and "Operator" are defined in sections 601 and 602A. These definitions are relevant only to CCSF's additional claim that the trial court erred in failing to impose the tax on certain of Flying Dutchman's valet parking activities, an issue we address later in this opinion.

[4] The parties are in apparent agreement that, because the equal protection challenge is not based on discrimination against a protected class, the "rational basis" test is applicable. (See *Gregory v. Ashcroft* (1991) 501 U.S. 452, 470 [115 L.Ed.2d 410, 111 S.Ct. 2395].)

part of the hotel or apartment premises; (2) parking by registered hotel guests in parking stations or facilities that are separate from the hotel premises so long as any parking charge to the guest is included as part of the hotel room rent; and (3) long-term parking by members of the United States military services while on active duty. (§ 606.) Under the ordinance, parking "operators" are required to collect the tax from the "occupant" and thereafter remit them to CCSF. (§§ 603, 604 & 608, subd. (e).) It is undisputed that none of these exemptions apply to Flying Dutchman's parking operations.

The trial court agreed with Flying Dutchman and held that the parking tax was unenforceable because it violated the equal protection clause in several respects. First, the court concluded there was no rational basis for the exemption favoring hotel and apartment guests who have "on premises" parking available to them, over guests and residents who must pay for "off premises" hotel and apartment parking.

As to apartment residents, the court then noted: "Residents who are unable to secure parking space on the same premises in which they reside must pay the tax on any parking space they hire. This tax liability is imposed not just in particularly congested areas of San Francisco, nor in particular areas in which there is a shortage of parking for residents, nor is it imposed only on those who utilize large parking garages operated in the city's core. Rather, the liability for parking tax is imposed on any resident of San Francisco who does not or cannot pay to park in a parking station which is part of that person's residential premises and therefore pays rent to park elsewhere, whether it is in her neighbor's vacant one-car garage, or a large parking lot. . . . No rational basis appears in the evidence nor in any argument advanced by CCSF to discriminate against the resident who is compelled to park off premises because no parking is available in the premises in which she resides."

The trial court had two concerns for the exemption favoring hotel guests who use hotel-provided on-premises parking.[5] First, while no parking tax is imposed on charges for on-premises hotel parking, guests are subjected to the parking tax if they must pay the hotel to park "off premises." The court found that "[n]o rational basis is suggested either by evidence or argument for that discrimination."

---

[5] The trial court noted that the term "hotel" is undefined in the parking tax ordinance. Nevertheless, like the undefined term "registered guest," the court seemed satisfied that the lawmakers' intent was to adopt the definitions of both terms found in San Francisco Police Code section 909, explaining that otherwise, "[i]t would be very difficult indeed to conceive of a reason why registered guests of motels . . . should be treated differently than occupants of something that has the word 'hotel' in its name."

Additionally, the ordinance further offers a safe haven for some of those registered hotel guests who must park "off premises" (and thus are nominally subject to the parking tax). If the hotel includes "rent" for off-premises parking as part of the overall room charge, no parking tax is imposed. Therefore, only registered hotel guests who are charged a separate parking charge for off-premises parking are subject to the tax. The trial court speculated that this latter distinction might derive from the fact that room rental charges are subject to a separate tax on "Transient Occupancy of Hotel Rooms" (art. 7, §§ 501–515.2). If both an occupancy tax and a parking tax were applicable to a unitary, undifferentiated room charge, it would subject the parking "rent" to a double tax (an occupancy tax and a parking tax). Excluding such charges from the parking tax eliminates this double tax dilemma. Nevertheless, because CCSF's transient occupancy tax was at a "much lower rate" than the parking tax, the trial court concluded that "[n]o reason which could justify such discrimination in the rate charged appears from either the evidence or argument."

Lastly, the court addressed the parking tax exemption afforded to active-duty members of the United States military who pay to store vehicles owned by them for a time period of at least 75 days. Concern was expressed because the exemption did not require that the active duty station of the owner be outside of San Francisco. This could allow a San Francisco-based active member of the military to avoid the parking tax under circumstances where: (a) the stored vehicle was a second vehicle owned by the armed forces member; (b) the vehicle was being stored while the member was outside of San Francisco for nonmilitary reasons; or (c) the principal user of the stored vehicle was someone other than the military member who was storing the vehicle while the civilian principal user was away (such as a child who used a vehicle owned by a parent-military member, and who stored it while away at college or on an extended vacation).

CCSF makes two claims of error. As a threshold argument, CCSF asserts that the trial court mistakenly placed the burden of proof on CCSF to come forth with evidence tending to establish a rational basis for enacting the exemptions. CCSF claims that under applicable constitutional law standards, it was incumbent on the court to determine if there might be *any* rational basis justifying the exemptions, and it was irrelevant that CCSF had not established facts explaining its reasoning. Secondarily, CCSF contends that one basis for each and every one of the noted exemptions was for the "administrative convenience" of CCSF, a legitimate rationale legally justify-ing the exemptions, and the court erred in rejecting it. (*City of San Jose v. Donohue* (1975) 51 Cal.App.3d 40, 45 [123 Cal.Rptr. 804]; *Seegmiller v. County of Nevada* (1997) 53 Cal.App.4th 1397, 1403 [62 Cal.Rptr.2d 238].)

"A statute violates the equal protection clause if it selects one particular class of persons for a species of taxation and no rational basis supports such classification. [Citation.] Further, a discrimination that bears no reasonable relation to a proper legislative objective is invalid. A legislative classification that is purely arbitrary and capricious and based upon no reasonable or substantial difference between classes is clearly unconstitutional. [Citation.]" (*John Tennant Memorial Homes, Inc. v. City of Pacific Grove* (1972) 27 Cal.App.3d 372, 379 [103 Cal.Rptr. 215].)

Under the applicable rational basis test, " '[w]e will not overturn such a [law] unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the [people's] actions were irrational.' ([*Vance v.*] *Bradley* [(1979)] 440 U.S. [93] at [p.] 97 . . . . See also *Pennell v. San Jose* [(1988)] 485 U.S. 1, 14 [99 L.Ed.2d 1, 108 S.Ct. 849] . . . .)" (*Gregory v. Ashcroft, supra*, 501 U.S. at p. 471.) Therefore, " 'the Equal Protection Clause is satisfied so long as there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.' (*Nordlinger v. Hahn* [(1991)] 505 U.S. 1, 11–12 [120 L.Ed.2d 1, 112 S.Ct. 2326] . . . .)" (*Fitzgerald v. Racing Assn. of Central Iowa* (2003) 539 U.S. 103, 107 [156 L.Ed.2d 97, 123 S.Ct. 2156].) This deference is particularly important " 'in the context of classifications made by complex tax laws' [citation]." (*Ibid.*; *Regan v. Taxation With Representation of Wash.* (1982) 461 U.S. 540, 547 [76 L.Ed.2d 129, 103 S.Ct. 1997] ["Legislatures have especially broad latitude in creating classifications and distinctions in tax statutes."].)

Under this deferential standard, government action " 'must be upheld against equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.* [Citations.] Where there are "plausible reasons" for [the classification] "our inquiry is at an end." ' [Citations.]" (*Warden v. State Bar* (1999) 21 Cal.4th 628, 644 [88 Cal.Rptr.2d 283, 982 P.2d 154] (*Warden*).) " '[A] legislative choice is not subject to courtroom factfinding and *may be based on rational speculation unsupported by evidence or empirical data.*' [Citations.] . . . [W]hen there is . . . reasonably conceivable justification for a classification, '[i]t is . . . "constitutionally irrelevant whether [the] reasoning in fact underlay the legislative decision" ' [citations], or whether the 'conceived reason for the challenged distinction actually motivated the legislature.' [Citation.]" (*Id.* at p. 650, italics added and in original.)

█ While we agree with CCSF that, under the rational basis standard, the party challenging a classification bears the burden of demonstrating its

invalidity (*Warden, supra,* 21 Cal.4th at p. 641), we disagree that the trial court improperly placed the burden of showing the existence of a rational governmental basis for the parking tax exemptions on CCSF. In this regard, the references in the court's statement of decision to the absence of "evidence" or "argument" pointing to rational bases for the exemptions are ambiguous. ▉ Rather, we conclude that the court erred in not finding a rational basis to support the parking tax exemptions, regardless of whether there was express evidence or empirical data supporting the exemptions.

The historic context of the time at which the parking tax was passed plays a significant role in the rational basis analysis we must perform. (See, e.g., *Kasler v. Lockyer* (2000) 23 Cal.4th 472, 482 [97 Cal.Rptr.2d 334, 2 P.3d 581] [reviewing "the circumstances giving rise" to the challenged classification].) As to the military exemption, it must be remembered that the parking tax and exemptions were enacted in the early 1970's, at the height of the Vietnam War. It was a time when city leaders were undoubtedly concerned about not having the parking tax apply to vehicles stored for long periods of time while their owners were called to arms in Southeast Asia. The need for this exemption is no less urgent, compassionate and respectful for those serving in the Middle East today.[6]

While the concerns for misuse of the military parking tax exemption voiced by the trial court may be more than hypothetical, it is not the role of a court considering an equal protection challenge to scuttle the law because there may exist circumstances where the purpose of the law could be eluded. "[U]nder the rational relationship standard, a court may not strike down a classification simply because the classification may be imperfect [citation] or because it may be 'to some extent both underinclusive and overinclusive.' [Citation.]" (*Warden, supra,* 21 Cal.4th at p. 649, fn. 13.) Instead, it is our role to determine if *any* rational basis exists for the exercise of governmental discretion to enact a law limiting economic protections to certain nonsuspect classes. We have little difficulty finding a rational basis for the military exemption here, as CCSF is entitled to give preference to military personnel in light of their service to the country. (*Regan v. Taxation with Representation of Wash., supra,* 461 U.S. at pp. 550–551.)

As to the residential apartment "on premises" tax exemption, we again disagree with the trial court that there is no legitimate policy reason for the adoption of that exemption. The 1970's were also a time of great real estate development and economic growth in San Francisco. By exempting apartment or long-term tenants from paying parking taxes, landlords who provided on-site parking for those tenants could charge more in rent or pass on the tax

---

[6] We note that the trial court's consideration of this case, as well as its statement of decision, predate March 2003, when our present war with Iraq commenced.

savings to tenants, in whole or part, depending on the rental market. Thus, in one respect, CCSF was ensuring that multi-unit residential developments were encouraged to build suitable, and necessary, parking facilities into their plans. This, in turn, unquestionably helped alleviate pressure on, and competition for, on-street parking—the bane of many city planners then and now. It also created a safer, more convenient parking environment for tenants.[7] Therefore, we readily envision several separate rational bases, any of which would support the on-premises residential parking tax exemption in the ordinance in question.

Although not identical, economics similarly provide the rational basis for the parking tax exemption for on-site hotel parking "rent." Once again the 1970's provide a temporal backdrop, during which some of the largest commercial structures in San Francisco were designed and built, including hotels. A hotel developer/owner providing on-premises parking was more competitive for guest business than a hotel developer/owner who did not, because of the added convenience to guests, and because those hotels could charge guests less for parking rents than hotels offering only off-site parking facilities (no need to add the 25 percent parking tax). Making hotel parking convenient and more affordable was important to San Francisco during the 1970's, when this great city saw its industrial and maritime economic bases eroding. In their place, international tourism and convention business arose to supplant industry and shipping as the city's commercial lifeblood. Convenient, more affordable hotel guest parking enhanced San Francisco's draw as a venue for this lucrative tourism and convention business.

At the same time, parking was becoming an increasingly pressing urban problem, not only in the residential neighborhoods, but also in the city's retail core. With the rise in tourism came a great influx of daily retail business into the downtown. Encouraging hotels to provide parking through an exemption from the parking tax kept hotel guest vehicles out of scarce downtown parking lots, thereby mitigating the need for shoppers visiting San Francisco's gold-plated shopping districts from having to compete for precious parking with transient hotel guests. Surely, the San Francisco Board of Supervisors could have properly concluded that the city had much more in tax revenues to be gained by encouraging tourism, conventioning, and retail shopping than those tax dollars lost through granting an on-premises parking tax exemption for hotels. Indeed, promoting tourism has been judicially confirmed to be a type of rational basis that is alone sufficient to overcome an

---

[7] By eliminating the parking tax from that portion of a tenant's rent attributable to parking, landlords and tenants were also spared the nightmarish task of being forced to allocate a portion of rent to parking, and to deal with the potential complex income tax issues raised by such an arbitrary allocation. Of course, in cases of off-premises apartment parking, the separation of rents is much simpler to achieve.

equal protection challenge. (*Valley Bank of Nevada v. Plus System, Inc.* (9th Cir. 1990) 914 F.2d 1186, 1195.)

As to the further exemption for off-premises hotel parking taxes where the "rent" is included as part of the room charge, we accept as reasonable the rationale rejected by the trial court. While the tax rate may be lower for occupancy taxes than the parking tax, granting the exemption can be justified in the interest of mollifying tourism interests by: (1) preventing the imposition on hotel guests of double taxation (parking and occupancy taxes), thereby reducing hotel costs; and (2) reducing the administrative burden on hotels, which were required to collect the separate taxes.

Flying Dutchman's reliance on *John Tennant Memorial Homes, Inc. v. City of Pacific Grove, supra,* 27 Cal.App.3d 372 is unavailing. In that case, this division determined that there existed no rational basis for Pacific Grove's imposition of an occupancy tax on residents of nonprofit retirement homes, while exempting from the tax residents of for-profit homes. (*Id.* at pp. 379–381, 103 Cal.Rptr. 215.) To the contrary, here we conclude that rational bases do indeed exist legally justifying the different classes of parking occupants offered exemptions from CCSF's parking tax; consequently, the parking tax does not violate the equal protection clause.[8]

## B. Flying Dutchman's Privileges and Immunities Claim

Relying on *Saenz v. Roe* (1999) 526 U.S. 489 [143 L.Ed.2d 689, 119 S.Ct. 1518], Flying Dutchman alternatively claims that even if its equal protection argument fails, CCSF's parking tax violates California's privileges and immunities clause contained in the state Constitution (Cal. Const., art. I, § 7, subd. (b)). In pertinent part, that constitutional provision provides: "A citizen or class of citizens may not be granted privileges or immunities not granted on the same terms to all citizens. . . ." (Cal. Const., art. I, § 7, subd. (b).) Flying Dutchman contends this clause applies because, unlike the federal Constitution, the state provision is not limited to prohibiting disparate treatment by law of citizens of California and nonresidents, but also to laws that apply unequally to classes of citizens of this state.

The trial court treated this claim as one arising under the *federal* Constitution, and concluded as such that Flying Dutchman lacked standing to bring this claim on behalf of nonresidents who might be aggrieved by the parking tax. Therefore, the trial court declined to decide this alternative constitutional

---

[8] Because we find that rational bases exist which legally justify the parking tax exemptions questioned by Flying Dutchman, we need not, and do not, address CCSF's further argument that the exemptions can be justified out of "administrative convenience." (*City of San Jose v. Donohue, supra,* 51 Cal.App.3d 40, 45.)

claim on the merits. We conclude that, even analyzing Flying Dutchman's claim under the state Constitution, it fails both because Flying Dutchman lacks standing to assert this claim under the facts of this case, and on the merits of the argument.

In making its claim, Flying Dutchman poses the inequity under the state's privileges and immunities clause as follows: "The differing parking tax burdens put on hotel occupants and residents offend the privileges and immunities clause. . . . A parker staying in a 'hotel' with integral parking is not taxed yet a parker staying in a 'hotel' without integral parking is taxed. Similarly, for residents—those with integral parking escape tax but those who rent from their friend or next door neighbor are taxed. . . ."

While the disparate treatment of both some hotel guests and residents exist under the ordinance, the simple fact remains that Flying Dutchman is neither. It does not offer any analysis indicating that it is aggrieved by this disparate treatment of hotel and residential parkers, and ignores the trial court's finding that it lacked standing to assert such a claim.

■ The simple answer to the standing question is that the privileges and immunities clause applies by its terms to "citizens." Thus, unlike the due process and equal protections rights, which attach to "persons," corporations are not entitled to the protection of the privileges and immunities clause because they are not "citizens." (*Blake v. McClung* (1898) 172 U.S. 239 [43 L.Ed. 432, 19 S.Ct. 165]; *Asbury Hospital v. Cass* (1945) 326 U.S. 207 [90 L.Ed. 6, 66 S.Ct. 61].)

■ The merits of Flying Dutchman's privileges and immunities argument are answered by our analysis of Flying Dutchman's equal protection claim. Under privileges and immunities jurisprudence, legislation that favors one class of citizens over another does not violate the clause unless the classification of citizens is unreasonable and arbitrary. (*People v. Housman* (1984) 163 Cal.App.3dSupp. 43, 52–53 [210 Cal.Rptr. 186].) Because we have determined that the parking tax exemptions challenged by Flying Dutchman are rationally related to a legitimate governmental interest or goal, we conclude that they are not unreasonable or arbitrary under the privileges and immunities clause of the state constitution.

### C. Flying Dutchman's Double Taxation on Real Property Claim

Another alternative argument raised by Flying Dutchman challenging enforcement of the parking tax is that it violates the constitutional prohibition against double taxation on real property. Flying Dutchman premises this

contention on article XIII, section 1 of the California Constitution, requiring that property be taxed on an ad valorem basis, a requirement that effectively prohibits double taxation. (*City of Oakland v. Digre* (1988) 205 Cal.App.3d 99, 104 [252 Cal.Rptr. 99]; and see *Flynn v. San Francisco* (1941) 18 Cal.2d 210, 215 [115 P.2d 3].) Because property taxes have been paid on the real estate upon which Flying Dutchman conducts its parking operations, Flying Dutchman claims CCSF's parking tax is a second and forbidden tax on that real estate. The trial court summarily denied this contention by concluding the parking tax was not a tax on the real estate itself, but a separate and legal tax on the *use* of that property. We agree.

Article XIII, section 1 of the California Constitution provides: "(a) All property is taxable and shall be assessed at the same percentage of fair market value. When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value."

■ No other method of taxing property per se is allowed in this state, other than the prescribed constitutional method. (*Flynn v. San Francisco, supra,* 18 Cal.2d 210; *City of Oakland v. Digre, supra,* 205 Cal.App.3d at p. 104.) However, an important distinction is made between the taxation of real estate ownership on an ad valorem basis, and a tax on the *use* of that real property. It has long been recognized that a tax on the separate use of the property, known as an excise tax, is permissible, and does not constitute double taxation. (*City of Berkeley v. Cukierman* (1993) 14 Cal.App.4th 1331 [18 Cal.Rptr.2d 478].) "The mere fact that the state (or local authority) imposes one excise tax upon one activity does not prevent the state or local authority from imposing another excise tax upon the same privilege for the same period. (*Fox etc. Corp. v. City of Bakersfield* (1950) 36 Cal.2d 136, 140 [222 P.2d 879] [citation].) To put it another way, the constitutional prohibition against double taxation applies only to ad valorem property taxes, and property tax and excise tax can be imposed simultaneously. (*Pesola v. City of Los Angeles* (1975) 54 Cal.App.3d 479, 485–486 [126 Cal.Rptr. 580] [citation].)" (*City of Berkeley v. Cukierman, supra,* 14 Cal.App.4th at pp. 1340–1341.)

Nevertheless, Flying Dutchman contends that the imposition of CCSF's parking tax is a tax on its "possessory interest" in real estate it holds, and therefore is a form of prohibited double tax. This arises from the belief that the parking tax is one imposed on Flying Dutchman's possession of real estate—a parking space located within a parking lot. In support it cites a host of cases in which ad valorem taxation of possessory interests of real property have been upheld, including *McCaslin v. DeCamp* (1967) 248 Cal.App.2d 13

[56 Cal.Rptr. 42] [terminable at-will monthly rental of residence owned by district was a taxable property right under Rev. & Tax. Code, § 107] and *Scott-Free River Expeditions, Inc. v. County of El Dorado* (1988) 203 Cal.App.3d 896 [250 Cal.Rptr. 504] [exclusive use of river for commercial purposes was a taxable interest in real property]; and *City of San Jose v. Carlson* (1997) 57 Cal.App.4th 1348 [67 Cal.Rptr.2d 719] [right to short-term-use convention facilities sufficient possessory interest to be taxable under Rev. & Tax. Code, § 107].

While these cases, and the other similar decisions cited by Flying Dutchman, clearly stand for the proposition that possessory interests in real estate are subject to ad valorem property taxes, none of them hold that excise taxes on certain uses of real property cannot also be imposed, not on the mere posses-sory interest, but on the use of that property interest. For example, Flying Dutchman may own real estate or have leasehold possessory interests in property located within San Francisco that is taxable as such—a formula-based market value tax. But the use to which those property interests are put can also be taxed. Such use taxes are not taxes against the property. (*City of Glendale v. Trondsen* (1957) 48 Cal.2d 93, 103 [308 P.2d 1].) This distinction is precisely the holding in cases such as *Pesola v. City of Los Angeles, supra,* 54 Cal.App.3d 479, and *City of Berkeley v. Cukierman, supra,* 14 Cal.App.4th 1331, cases Flying Dutchman is understandably unable to explain away.

Similarly, in its reply brief and at oral argument, Flying Dutchman relied on *Thomas v. City of East Palo Alto* (1997) 53 Cal.App.4th 1084 [62 Cal.Rptr.2d 185], a case out of Division Five of this court. However, once again the challenged tax was a city-wide parcel tax that was "levied based upon mere ownership and type of real property, and not on any separate incident to property ownership . . . ." (*Id.* at p. 1086.)

We agree with the trial court that CCSF's parking tax is a proper excise or use tax, and not a property tax. Consequently, it does not violate the prohibition in the California Constitution against double taxation.

### D. Flying Dutchman's Claim that the Parking Tax Is an Invalid "Special Tax" Under Proposition 13

Lastly, Flying Dutchman claims the trial court erred in rejecting its argument that the parking tax was invalid to the extent that it violates Proposition 13. Proposition 13 amended the California Constitution by adding article XIII A. Section 4 of that article states: "Cities, counties, and special districts, by a two-thirds vote of the qualified electors of such district, may impose special taxes on such district, except ad valorem taxes on real property or a transaction tax or sales tax on the sale of real property within such City, County or special district." (Cal. Const., art. XIII A, § 4.)

Flying Dutchman asserts that the parking tax is just such a special tax because, rather than all of the collected taxes being deposited into CCSF's general fund, by local ordinance one-third of the parking tax is slated exclusively for use to support senior citizen programs. The trial court ruled that the issue was mooted by its ruling on Flying Dutchman's equal protection argument. Nevertheless, the court also noted that if "it subsequently be[comes] relevant," the argument fails because the savings clause of the parking tax ordinance (§ 616) would become operable, thereby voiding the allocation and returning all funds to the general fund.

On November 25, 1977, then-Mayor George Moscone signed ordinance No. 534-77 (the 1977 Ordinance). The 1977 Ordinance directed that, *for the 1977–1978 fiscal year*, no more than $3.5 million of parking taxes collected would be deposited into CCSF's general fund. Any balance "in fiscal year 1977–78 shall be used exclusively for senior citizens' programs, including, but not limited to, nutrition programs, escort service programs, housing and rent supplements, and Municipal Railway operating purposes . . . ."

■ The following June, Proposition 13 was passed by California voters, which amended the Constitution as noted above. By this amendment, local governments were thereafter required to place on the ballot and obtain the approval of two-thirds of the voters voting in the election before any "special taxes" could be passed and imposed. A "special tax" has been judicially defined as one levied for a specific purpose, rather than one imposed to generate revenues for general governmental uses, and which would be deposited in the entity's general fund. (*City and County of San Francisco v. Farrell* (1982) 32 Cal.3d 47, 53–54 [184 Cal.Rptr. 713, 648 P.2d 935].)

*After* Proposition 13 became effective, CCSF passed, and the mayor signed, Ordinance No. 424-78 (the 1978 Ordinance), which added section 615, subdivision (a)(3) to the Business and Revenue Code. That new section read:[9] "Effective July 1, 1978, 66-2/3 percent of the balance of the moneys collected, pursuant to the provisions of this Article shall be deposited in the General Fund. The remaining 33-1/3 percent of the balance of the moneys collected shall be used exclusively for senior citizens' programs, provided, however[,] that appropriations for said senior citizens' programs shall be made by the Board of Supervisors pursuant to the budget and fiscal provisions of the Charter; and further provided that no portion of these funds shall be used for the studies or consultant services for senior citizens' services and programs; and provided further that the Board of Supervisors shall expend a

---

[9] Apparently, section 615 has been amended twice since the 1978 Ordinance: in 1979 (Ordinance No. 433-79) and in 1998 (Ordinance No. 20-98). The text of the present version of subdivision 3 is the same as that contained in the record, although there is no longer any subdivision (a) designation under that section.

portion of said funds for the continual auditing and monitoring of all senior citizens' programs by the Budget Analyst."

CCSF contends that the operative ordinance is the 1977 Ordinance, which was passed before Proposition 13, and cites us to *Kehrlein v. City of Oakland* (1981) 116 Cal.App.3d 332 [172 Cal.Rptr. 111], which held that where "the ordinance[] predate[s] article XIII A, no compliance with the two-thirds requirement of section 4 was necessary." (*Id.* at p. 340.) However, we agree with Flying Dutchman that the 1977 Ordinance, by it own terms, was applicable to fiscal year 1977–1978 *only*. It was followed by the 1978 Ordinance, which was enacted after Proposition 13 was passed, and could not take effect unless and until approved by a two-thirds vote. (Cal. Const., art. XIII A, § 4.) Thus, CCSF's argument that the 1978 Ordinance relates back to the enactment date of the 1977 Ordinance, because the second ordinance was a mere continuance of the first ordinance, is not supported by the language of the ordinances themselves.

Furthermore, while the subject matters of the two ordinances are similar (both concern allocating parking tax revenues to senior citizens programs), they are different in certain material ways. The 1977 Ordinance required that the first $3.5 million of parking taxes collected would be deposited into the general fund, and that all additional tax revenues would go to the specified senior programs. On the other hand, the 1978 Ordinance allocated two-thirds of all collected revenues from the first dollar into the general fund, and the remaining one-third of all collected revenues to be spent for enumerated senior citizen purposes. Unlike the 1977 Ordinance, the 1978 Ordinance also modified the uses to which the revenues allocated for senior citizen programs could be spent: "[N]utrition programs, escort service programs, housing and rent supplements, *transportation and recreation*. . . ." For these reasons, the two ordinances cannot benefit from the exception noted in *Kehrlein v. City of Oakland, supra*, 116 Cal.App.3d 332. Accordingly, section 615, subdivision (a)(3) violates the California Constitution, and is unenforceable.

■ Nevertheless, we agree with the trial court that the fact that section 615, subdivision (a)(3) violates Proposition 13 does not doom the entire parking ordinance scheme. The incompatibility between section 615, subdivision (a)(3) and Proposition 13 can be rectified by invoking the savings clause of the parking ordinance (§ 616). That clause states in important part: ". . . [N]or shall this ordinance be construed as requiring the payment of any tax prohibited by . . . the Constitution of the State of California. [¶] If any Section, SubSection, subdivision, paragraph, sentence, clause or phrase of this Article or any part thereof is for any reason held to be unconstitutional, such decision shall not affect the validity of the remaining portions of this Article or any part thereof. The Board of Supervisors hereby declares that it

would have passed each Section, SubSection, subdivision, paragraph, sentence, clause or phrase thereof, irrespective of the fact that any one or more Sections, SubSections, subdivisions, paragraphs, sentences, clauses or phrases be declared unconstitutional." (§ 616.)

Flying Dutchman acknowledges that resort to the savings clause quoted above allows this court to enforce the parking ordinance by ordering taxes *paid in future years* to be placed in CCSF's general fund. (*Calfarm Ins. Co. v. Deukmejian* (1989) 48 Cal.3d 805, 821 [258 Cal.Rptr. 161, 771 P.2d 1247].) However, it asserts that any collected taxes applicable to preceding years must be reduced by one-third, the percentage of the senior citizen "special tax" allocation.

Flying Dutchman's argument for a tax liability reduction might have more resonance were this a refund action.[10] However, this action is one for the initial collection of the tax, and Flying Dutchman cites us to no authority that would limit the ability of this court to invoke the savings clause, strike section 615, subdivision (a)(3), and order the tax arrearages to be paid in full and placed in CCSF's general fund.

### E. Flying Dutchman's Valet Parking Activities

■ Not only does CCSF claim the trial court erred by sustaining Flying Dutchman's equal protection challenge to the parking tax, but claims it also erred by ruling that the parking tax did not apply to Flying Dutchman's valet services where Flying Dutchman did not pay for the property on which it parked cars. We agree with the trial court.

Among the services provided by Flying Dutchman was valet parking for which it was hired by a "host" to take vehicles from "guests," park them, and return them to the guests as the guests left the host's function. Flying Dutchman received a fee from the host for providing these services. The statement of decision notes that when guest vehicles were taken by Flying Dutchman's valet attendants, they were parked: (1) on the premises of the host (or on-the-street parking), for which Flying Dutchman paid no fee; or (2) on private premises, such as an existing lot, for which Flying Dutchman paid a fee, but also where it controlled use of the premises for at least the duration of the event.[11]

---

[10] For example, one of the principal cases relied on by Flying Dutchman to support its invalid special tax argument, *Reich v. Collins* (1994) 513 U.S. 106 [130 L.Ed.2d 454, 115 S.Ct. 547], was a tax refund action.

[11] The facts taken from the statement of decision on this point are undisputed by the parties. What *is* disputed is how the parking tax ordinance should be interpreted in light of these facts. The trial court also considered a third valet scenario, where Flying Dutchman paid a per car

Were it not for the parking taxes' equal protection violation, the trial court concluded that Flying Dutchman would owe CCSF taxes only if it received "rent" for the parking space used during valet operations, and then only where Flying Dutchman was the "operator" of the "parking station" used (e.g., it did not pay rent to another who "operated" the parking station). The importance of the definitions contained in the parking tax ordinance cannot be overstated in analyzing this issue.

An "operator" is defined under the ordinance as: "Any person operating a parking station in the City and County of San Francisco, including but not limited to, the owner or proprietor of such premises, lessee, sublessee, mortgagee in possession, licensee or any other person otherwise operating such parking station. A person who otherwise qualifies as an operator as herein defined shall not, by reason of the fact that he was exempt from the tax herein imposed, be exempted from the obligations of an operator hereunder." (§ 601, former subd. (b) [now subd. (a)].)

An "occupant" is defined under the ordinance as: "A person who, for a consideration, uses, possesses or has the right to use or possess any space for the parking of a motor vehicle in a parking station under any lease, concession, permit, right of access, license to use or other agreement or otherwise." (§ 601, former subd. (c) [now subd. (b)].)

"Occupancy" is defined under the ordinance as: "The use or possession or the right to the use or possession of any space for the parking of a motor vehicle in a parking station." (§ 601, former subd. (d) [now subd. (c)].)

A "parking station" as used in the ordinance "shall include, but is not limited to: [¶] (1) Any outdoor space or uncovered plot, place, lot, parcel, yard or enclosure, or any portion thereof, where motor vehicles may be parked, stored, housed or kept, for which any charge is made. [¶] (2) Any building or structure, or any portion thereof in which motor vehicles may be parked, stored, housed or kept, for which any charge is made." (§ 601, former subd. (e) [now subd. d)].)

Lastly, "rent" is defined under the ordinance as: "The consideration received for occupancy valued in money, whether received in money or otherwise, including all receipts, cash, credits and property or services of any kind or nature, and also the amount for which credit is allowed by the operator to the occupant without any deduction therefrom whatsoever." (§ 601, former subd. (g) [now subd. (f)].)

---

fee to another parking station "operator." However, because it did not appear that there was any evidence offered showing this scenario actually occurred, the trial court did not rule on the subissue.

When the language of an ordinance provides a specific result, it is a court's duty to apply it as worded and equally its duty not to engage in construction. (*Delaney v. Superior Court* (1990) 50 Cal.3d 785, 800 [268 Cal.Rptr. 753, 789 P.2d 934].) Harmonizing these definitions with the application of the parking tax, in the first instance it is the legal responsibility of one (the "occupant") who gives consideration to another (pays "rent") to "occupy" a parking space in a "parking station" in San Francisco to pay the parking tax. (§ 603.)[12] However, if the "operator" of a "parking station" fails to collect the tax, it becomes the responsibility of the "operator" to make payment to CCSF. (§ 604.)[13] Thus, in the normal parking situation, one who wishes to park a vehicle must pay the tax if "rent" is paid to "occupy" a parking space in a "parking station." If the tax is not paid by the occupant (e.g., person wishing to park), then that legal responsibility passes to the one to whom the "rent" is paid, but only if that latter person or entity is an "operator" of a "parking station."

In April 1972, section 602A was added (and subsequently amended in 1998), expanding the definition of "rent" for purposes of the parking tax ordinance. In material part, the new section provided: "The term 'rent,' as defined in Section 601(g) [now subdivision (f)], shall be deemed to include the total charges required to be paid by an occupant (including but not limited to, any valet or service labor charge) in connection with the use or occupancy of parking space . . . ." Perhaps with a spoonful of irony, the amendment concludes with: "The Board of Supervisors hereby declares its intent that from its initial enactment, the parking tax was intended to include and exclude the charges set forth in this Section 602A. *The Board of Supervisors further declares that the addition of this Section 602A is not intended to make*

---

[12] "SEC. 603. Occupant to Pay Tax to Operator. [¶] Unless prohibited by the laws of the United States, the State of California, or exempted by the provisions of this Article, every occupant occupying parking space in a parking station in this City and County shall be required to pay the tax imposed herein to the operator along with the rent for occupancy. This obligation is not satisfied until the tax has been paid to the City and County, except that a receipt indicating payment of the rent from an operator maintaining a place of business in this City and County or from an operator who is authorized by the Tax Collector to collect the tax shall be sufficient to relieve the occupant from further liability for the tax to which the receipt refers."

[13] Section 604 states in pari materia: "Every operator maintaining a place of business in this City and County as provided in Section 603 herein, and renting parking space in a parking station in this City and County to an occupant who is not exempted under Section 606 of this Article or elsewhere in this Code, shall at the time of collecting the rent from the occupant, collect the tax from the occupant and on demand shall give to the occupant a receipt therefor. In all cases in which the tax is not collected by the operator, as aforesaid, the operator shall be liable to the Tax Collector of the City and County for the amount of tax due on the amount of taxable rent collected from the occupant under the provisions of this Article the same as though the tax were paid by the occupant."

*any substantive change in the Parking Tax Ordinance, but is enacted for clarification purposes only.*" (Italics added.)

Important in our view was that, while it expanded the definition of "rent," the law still required that the person or entity to whom the "rent" was paid be an "operator" of a "parking station" before it could be charged with the tax not paid by an "occupant." The trial court concluded essentially that Flying Dutchman's valet parking "rent" was not subject to the tax except under circumstances where the guest vehicle was "occupying" a parking space in a "parking station" which Flying Dutchman "operated." We agree.

One of the valet parking scenarios referenced in the court's statement of decision is where a guest vehicle was taken by Flying Dutchman's valet attendants, and parked on the premises of the host (or on-the-street parking), for which no remuneration was paid. Under these facts, Flying Dutchman, even if deemed an "operator," had no tax liability because it was not operating a "parking station"; a "parking station" being limited to a parking space for which a "charge is made." (§ 601, former subd. (e)(1) [now subd. (d)(1)].) Since no charge was being made for the parking space, the labor or valet fee charged is not taxable under the parking tax ordinance as written.

However, where the guest's vehicle was taken by Flying Dutchman's valet attendant and parked on premises for which some charge was made, then the "parking station" requirement of the ordinance has been met. If, in addition, Flying Dutchman qualified as the "operator" of that parking station, it was liable for the tax on the entire rent received—that for the space and the valet service—if the tax was not paid by the occupant/guest. We have no difficulty concluding that when Flying Dutchman controlled the use of the premises where its valet attendants parked the vehicles for at least the duration of the event, it was an "operator" as contemplated by the ordinance. (§ 601, former subd. (a) [now subd. (b)].)

CCSF urges that the trial court's interpretation failed to give effect to the amendment's language specifically adding valet service charges to the definition of "rent" under the ordinance. Not so. The purpose and effect of the amendment is to include within the parking tax the valet service portion of a total rent charge paid for parking in San Francisco. However, there is no intent in the ordinance to tax valet service charges alone. After all, at bottom the scheme of the ordinance is to tax the use of property, and not to tax a service business. In this regard, CCSF cannot now ignore its own characterization of the tax as an excise tax or one on the use of real property made in response to Flying Dutchman's ad valorem double taxation claim. Under these circumstances, we find nothing "absurd" about exempting charges made

by a valet business to the extent it does not generate revenue from vehicle parking.

## IV.

### Disposition

The judgment is reversed. The case is hereby remanded to the trial court to enter a new judgment consistent with this opinion, including the amount of tax due and owing, together with any accrued interest. The subsequent judgment shall direct that the amount of the judgment, when paid by Flying Dutchman, shall be deposited in CCSF's general fund and not be subject to the allocation provided for in section 615, subdivision (a)(3), which provision we declare to be unconstitutional. Costs on appeal are awarded to CCSF.

Haerle, Acting P. J., and Lambden, J., concurred.

A petition for a rehearing was denied September 30, 2004, and the petition of defendants and appellants for review by the Supreme Court was denied December 15, 2004.