Opinion
HUMES, P.
This case asks us to decide whether the City and County of San Francisco (San Francisco) can compel state universities that operate parking lots in the city to collect city taxes from parking users and remit them to San Francisco. The answer turns on whether the California Constitution’s “home-rule provision”—which grants charter cities broad powers, including the power to tax—creates an exception to the long-recognized doctrine that exempts state entities from local regulation when they are performing governmental functions. We conclude that it does not. As a result, we affirm the trial court’s denial of San Francisco’s petition for writ of mandate.
I. Background
For over 40 years, San Francisco has had an ordinance that imposes a tax on parking lot users for the “rent” paid to occupy private parking spaces in the city. (S.F. Bus. & Tax Regs. Code, art. 9, §§ 602, 606; see City and County of San Francisco v. Flying Dutchman Park, Inc. (2004) 122 Cal.App.4th 74, 80 [18 Cal.Rptr.3d 532].) Since 1980, the amount of the tax has been 25 percent of the rent. (S.F. Bus. & Tax Regs. Code, art. 9, §§ 602, 602.5.) Under the ordinance, parking lot users owe the tax, but parking lot operators are required to collect the tax when the users pay to park. {Id., art. 9, §§ 603, 604, subd. (a).) The operator is required to hold the collected taxes in trust for, and periodically remit them to, San Francisco. (Id., art. 6, §§ 6.7-1, 6.7-2.) If an operator fails to collect a parking tax from a user, the operator is liable for it. (Id., art. 6, § 6.7-1, subd. (d), art. 9, § 604, subd. (a).)
The ordinance states it is not to be construed as imposing a tax on the state or its political subdivisions. (S.F. Bus. & Tax Regs. Code, art. 6, § 6.8-1, subd. (a)(2).) Still, these “exempt” entities must “collect, report, and remit” the tax {id., art. 6, § 6.8-1, subd. (b); id., art. 9, § 601, subd. (a)), pay any taxes that they fail to collect (see id., art. 9, § 604, subd. (a)), and comply with various administrative obligations, such as obtaining a certificate of authority to operate a parking lot; maintaining a log of, and bearing the burden of explaining, all lost parking tickets and cancelled transactions {id., art. 9, § 604, subd. (c)); and filing monthly parking tax returns {id., art. 6, § 6.7-2, subds. (b) & (c)).
*1111 The defendants, which we will refer to as the universities, are the Regents of the University of California (Regents), which is responsible for the operation of the University of California, San Francisco (UCSF); the board of directors of University of California Hastings College of the Law (Hastings); and the board of trustees of the California State University (CSU), which is responsible for the operation of San Francisco State University (SFSU). The universities operate parking lots within San Francisco on property that is mostly owned by the state. All of these lots are in close proximity to other university facilities. Students, faculty, administrators, guests, patients at certain medical facilities, and with a few exceptions, members of the general public may pay to park in them.
The universities have never collected or remitted city parking taxes. In 1983, San Francisco tried to recover an alleged parking-tax deficiency from UCSF, but the Regents claimed immunity and San Francisco dropped the matter. The current controversy was prompted almost 30 years later, when in 2011 San Francisco directed the universities to start collecting and remitting the parking tax. After the universities refused, San Francisco petitioned the trial court for a writ of mandate to force compliance. The court denied the writ, ruling that the universities are immune from complying with the ordinance because they have not expressly consented to collecting and remitting the tax and their parking lot operations are a governmental, not a proprietary, function.
II. Discussion
A. The Standard of Review.
“ ‘In reviewing a trial court’s judgment on a petition for writ of ordinary mandate [brought under Code Civ. Proc., § 1085], we apply the substantial evidence test to the trial court’s factual findings. However, we exercise our independent judgment on legal issues . . . .’ ” (City of Oakland v. Oakland Police & Fire Retirement System (2014) 224 Cal.App.4th 210, 226 [169 Cal.Rptr.3d 51].) Where, as here, the facts are undisputed, the issue whether a state entity is exempt from complying with a local ordinance presents a question of law that we review de novo. (Bame v. City of Del Mar (2001) 86 Cal.App.4th 1346, 1354 [104 Cal.Rptr.2d 183] (Bame): see also California Public Records Research, Inc. v. County of Stanislaus (2016) 246 Cal.App.4th 1432, 1443 [201 Cal.Rptr.3d 745].)
B. The Parties’ Constitutional Powers.
San Francisco is a charter city, and as such it has broad powers by virtue of the California Constitution’s home-rule provision. (Cal. Const., art. XI, § 5, *1112 subd. (a).) These powers include the authority to “make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in [its] several charters.” {Ibid.) The “power to tax for local purposes clearly is one of the privileges accorded chartered cities by [the home-rule provision].” (Weekes v. City of Oakland (1978) 21 Cal.3d 386, 392 [146 Cal.Rptr. 558, 579 P.2d 449] (Weekes).)
The universities’ constitutional powers are similarly substantial. The Regents governs a statewide system of campuses, including UCSF, and is vested with “full powers of organization and government” and has “all the powers necessary or convenient for the effective administration of [the University of California’s] trust,” including “the management and disposition of the property of the university.” (Cal. Const., art. IX, § 9, subds. (a) & (1).) “Article IX, section 9, grants the [R]egents broad powers to organize and govern the university and limits the Legislature’s power to regulate either the university or the [R]egents. This contrasts with the comprehensive power of regulation the Legislature possesses over other state agencies.” (San Francisco Labor Council v. Regents of University of California (1980) 26 Cal.3d 785, 788 [163 Cal.Rptr. 460, 608 P.2d 277].)
Hastings is “affiliated with the University of California and is the law department thereof,” and it is governed by a board of directors appointed by the Governor and approved by the Senate. (Ed. Code, §§ 92201, 92206.) Its mission is to “afford facilities for the acquisition of legal learning in all branches of the law.” (Id., § 92202.)
Lastly, CSU is a constitutionally authorized “state agency created by the Legislature in the field of public higher education which is charged with the management, administration, and control of the State College System of California.” (Cal. Const., art. XX, § 23; Ed. Code, §§ 66600 et seq., 89000 et seq.) The CSU system is governed by a board of trustees. (Ed. Code, § 66600.) SFSU is part of this system, and its structure and mission are set forth in state statutes. {Id., § 89001 et seq.)
C. The Doctrine Exempting State Entities from Local Regulation.
Over 60 years ago, our state Supreme Court held that when the state “engages in such sovereign activities as the construction and maintenance of its buildings, as differentiated from enacting laws for the conduct of the public at large, it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation.” (Hall v. City of Taft (1956) 47 Cal.2d 177, 183 [302 P.2d 574] (Hall).) Under this doctrine, courts evaluate whether the endeavor in which a state entity is engaged is a *1113 “sovereign activity].” (Ibid.) If it is, the state entity is exempt from complying with local regulation unless constitutional or statutory provisions provide otherwise.[1] (Hall, at p. 183.)
In the decades since Hall, courts have applied the doctrine to bar attempts by local jurisdictions to regulate state entities engaged in governmental activities. (See, e.g., Bame, supra, 86 Cal.App.4th at p. 1357 [state agricultural district’s operation of fairground governmental activity and therefore operators contracting with district exempt from local regulation]; Laidlaw Waste Systems, Inc. v. Bay Cities Services, Inc. (1996) 43 Cal.App.4th 630, 637-639 [50 Cal.Rptr.2d 824] (Laidlaw) [school district is state agency exempt from city regulations involving trash collection]; Del Norte Disposal, Inc. v. Department of Corrections (1994) 26 Cal.App.4th 1009, 1015 [31 Cal.Rptr.2d 746] [“state prisons are matters of state, not local, concern” and their operations therefore exempt from local ordinance giving exclusive franchise to certain trash hauler]; City of Santa Ana v. Board of Education (1967) 255 Cal.App.2d 178, 180 [62 Cal.Rptr. 863] [same as Laidlaw].)
The doctrine has specifically been applied to bar a charter city’s attempt to regulate the construction of a university building by the Regents. In Regents of University of California v. City of Santa Monica (1978) 77 Cal.App.3d 130 [143 Cal.Rptr. 276], the Court of Appeal cited Hall in holding that Santa Monica could not force the Regents to obtain a building permit and pay city inspection fees as a condition for constructing a university building in the city. (Id. at p. 136.) In concluding that constructing university buildings is a governmental activity, the court pointed to the constitutional provision that vests the Regents with “ ‘the legal title and management of [the] property of the University of California’ ” and gives it “the unrestricted power to take and hold real and personal property for the benefit of the university.” (Ibid.; see Cal. Const., art. IX, § 9, subd. (1).)
While courts since Hall have barred local regulation of state entities engaged in governmental activities, they have allowed local regulation of *1114 state entities engaged in proprietary activities. In Board of Trustees v. City of Los Angeles (1975) 49 Cal.App.3d 45 [122 Cal.Rptr. 361], the Court of Appeal held that Los Angeles, a charter city, could regulate a circus held on property owned by CSU at Northridge. (Id, at p. 47.) The court determined that the doctrine exempting state entities from local regulation was inapplicable because the circus operations were a “revenue-producing activity” that had “no relation to the governmental function of the university.” (Id. at p. 50.) Similarly, in City of Modesto v. Modesto Irrigation Dist. (1973) 34 Cal.App.3d 504 [110 Cal.Rptr. 111] (City of Modesto), the Court of Appeal held that Modesto could require state irrigation districts to collect a tax imposed on users of the districts’ electricity because “an irrigation district which manufactures, distributes[,] and sells electrical energy, in competition with public service corporations, is engaged in a proprietary activity.” (Id. at pp. 506-507.)
Thus, the analytical framework under the doctrine is straightforward: state entities are exempt from otherwise-valid local regulation when they are engaged in governmental activities unless a constitutional provision or statute says they are not exempt. (Hall, supra, 47 Cal.2d at p. 183.) While state entities are free to comply voluntarily with local measures to further the public interest, and we expect they often do, they cannot be forced to comply with those measures when they are performing their governmental functions.
D. The Universities Are Exempt from the Ordinance Under the Doctrine Recognized in Hall.
Applying Hall’s analytical framework to the case before us, we conclude that the doctrine exempting state entities from local regulation defeats San Francisco’s effort to compel the universities to comply with the ordinance.[2] The universities’ parking operations are governmental activities, and the universities are therefore exempt from the ordinance, as it is undisputed that no constitutional provision or statute provides otherwise.
As we have mentioned, the state’s exemption from local regulation “is limited to situations where [a state entity] is operating in its governmental capacity” as opposed to engaging in “proprietary activity.” (Bame, supra, 86 Cal.App.4th at p. 1356.) This distinction between governmental and proprietary activity “remains viable in the context of encroachment of municipal *1115 regulations” even though it ‘“is no longer applicable to determine governmental tort liability [under principles of sovereign immunity],” the area in which it developed. (Ibid.; see 8 Witkin, Summary of Cal. Law (10th ed. 2005) Constitutional Law, § 991.) ‘“The scope of the relevant inquiry is defined by the particular activities in question” and whether they are related to the state entity’s governmental purposes. (Batne, at p. 1357.)
The trial court found that the universities are furthering governmental purposes in operating their parking lots, and we agree. As the court explained, the undisputed evidence established that providing parking for students, faculty, staff, and visitors is integral to the universities’ educational and, in the case of the UCSF hospitals, clinical purposes.
As to UCSF, the trial court found that the ‘“parking facilities are used for staff, faculty, students, researchers, patients receiving inpatient and outpatient care, and visitors. Parking facilities are critical to UCSF because it is located in a densely populated urban environment and is a very decentralized campus. UCSF’s parking facilities are important in meeting [its] clinical and life-safety mission,” and ‘“UCSF uses its parking fee revenue to fund a shuttle bus service for students, faculty[,] and staff between its various locations, including San Francisco General and the VA Hospital.”
As to Hastings, the trial court found that ‘“[t]he garage provides access to the campus”—which “is located in an urban area with limited street parking”—“for students, faculty, staff, [and] others who attend events [there].” The garage also “plays an important role in . . . Hastings’[s] effort to maintain a safe and secure environment for its students. The . . . library is open until 11:00 p.m. and even later during finals,” and “[t]he garage provides a safe, well-lit[,] and convenient way to leave the campus and encourage continued use of the library and other school facilities for study purposes.”
Finally, as to CSU, the trial court found that “the operation of nine parking facilities on the SFSU campus constitutes an activity that is integral to CSU’s educational mission and bears a direct and necessary relationship to its functioning. [SFSU] is located in an urban environment where available parking for students, staff[,] and visitors in scarce. Each of CSU’s parking stations provides ready access to campus facilities for those who cannot use public transportation to get there. The parking stations are also used by visitors to the [SFSU] campus for the purposes of attending meetings, lectures, arts performances[,] and other educational events.”
In challenging the trial court’s determination that the operation of the universities’ parking lots is a governmental activity, San Francisco contends *1116 that ‘“[t]he essential question in the analysis ... is whether the municipal provision regulates the ‘main purpose’ of the [state] agency.” (Quoting City of Modesto, supra, 34 Cal.App.3d at p. 507.) It argues that the universities’ ‘“main purpose is not to provide parking, let alone paid parking,” but ‘“is education. The tax here, however, is not on the education of undergraduates, training in medicine, training in law, or the like. It is on paid parking.”
We reject San Francisco’s cramped view that the universities’ governmental role is to provide education but nothing related to it. To be sure, we agree with San Francisco that an activity is not necessarily governmental just because it generates revenue used to support a state entity’s purpose. (See, e.g., Board of Trustees v. City of Los Angeles, supra, 49 Cal.App.3d at pp. 47, 49-50; City of Modesto, supra, 34 Cal.App.3d at p. 507.) But operating university parking lots is not simply a revenue-generating endeavor; it is an activity that directly supports the universities’ educational and clinical functions by enabling students, staff, and visitors to access university programs and facilities.
Even if operating parking facilities might fall outside the governmental mission of some state entities, it is within the mission of the universities. All of them are directly or indirectly empowered to operate parking facilities by constitutional or statutory provisions that allow them generally to manage their facilities and real estate or specifically to provide parking. (Cal. Const., art. IX, § 9, subd. (1) [Regents vested with “management . . . of . . . property”]; Ed. Code, §§ 89701, subd. (a) [CSU “authorized to . . . construct, operate, and maintain motor vehicle parking facilities”], 92202 [Hastings “shall afford facilities” for legal learning].)
Because the universities’ parking operations support the universities’ educational and clinical programs and are directly or indirectly authorized by constitutional or statutory provisions, we reject San Francisco’s argument that they are a proprietary activity falling outside the doctrine exempting state entities from local regulation.
E. There Is No Exception to the Doctrine Exempting State Entities from Local Regulation for Charter Cities’ Tax-related Measures.
San Francisco maintains that Hall’s analytical framework is inapplicable because the ordinance’s collection-and-remittance requirement is not “regulatory” but is instead a “revenue measure.” Although San Francisco does not dispute that the universities are exempt from paying local taxes themselves, it contends that the home-rule provision confers on charter cities the authority to require state entities to undertake “reasonable measures” to collect and remit local taxes. In other words, San Francisco asserts that, even though *1117 state entities are exempt from local taxes and local regulatory measures, they are not exempt from local measures requiring them to collect and remit taxes. We are not persuaded. San Francisco’s argument draws from the law governing state preemption, but that law is largely inapplicable, and even under that law, the distinction between tax and regulatory measures has been abandoned. Our state Supreme Court has never endorsed extrapolating such a distinction to the doctrine exempting state entities from local regulation, and we decline to do so for the first time here.
We begin by reiterating our agreement with San Francisco that the home-rule provision confers broad powers on charter cities. “Charter cities are specifically authorized by our state Constitution to govern themselves, free of state legislative intrusion, as to those matters deemed municipal affairs.” (State Building & Construction Trades Council of California v. City of Vista (2012) 54 Cal.4th 547, 555 [143 Cal.Rptr.3d 529, 279 P.3d 1022].) The home-rule provision “represents an ‘affirmative constitutional grant to charter cities of “all powers appropriate for a municipality to possess . . .” and [includes] the important corollary that “so far as ‘municipal affairs’ are concerned,” charter cities are “supreme and beyond the reach of legislative enactment.” ’ ” (Id. at p. 556; see California Fed. Savings & Loan Assn. v. City of Los Angeles (1991) 54 Cal.3d 1, 11-18 [283 Cal.Rptr. 569, 812 P.2d 916] (California Federal).) As we have observed, these broad powers include the power to tax. (Weekes, supra, 21 Cal.3d at p. 392.)
But no Supreme Court case has intimated, and no Court of Appeal decision has directly held, that these broad powers trump the doctrine exempting state entities from local regulation. At least two Court of Appeal cases have explicitly held that they do not. In the first, Laidlaw, supra, 43 Cal.App.4th 630, the plaintiff argued that the home-rule provision authorized charter cities to regulate state entities engaged in governmental activities so long as the cities were regulating matters pertaining to municipal affairs, in that case garbage collection. In emphatically rejecting the argument, the Court of Appeal stated,
“[This] argument confuses the issues of preemption and sovereign immunity. The issue ... is not [as it would be under preemption analysis] whether the City has [authority under the home-rule provision] over garbage collection within its city limits. Unquestionably, local governments have that authority .... [Citations.]
“The issue here is not preemption; the issue is whether state agencies are exempt from local trash collection regulations under the doctrine of sovereign immunity. Hall, City of Santa Ana, and Del Norte make clear state agencies are indeed immune from such local regulation absent an express legislative or *1118 constitutional waiver of that immunity. Since the question is one of immunity, not preemption, it makes no difference whether the local governmental entity is a charter city as opposed to some other form of local government. The sovereign immunity of a state agency from local regulation does not depend upon the source of the local governmental entity’s authority to make regulations, it depends upon whether consent to regulation has been expressly stated by the Legislature or in the state Constitution.” (Laidlaw, supra, 43 Cal.App.4th at pp. 638-639, italics added.) Laidlaw’s holding that charter cities’ powers under the home-rule provision do not overcome state entities’ exemption from local regulation was decisively confirmed in Bame. Quoting Laidlaw at length, Bame repeated that the source of a city’s authority is irrelevant to the analysis. (Bame, supra, 86 Cal.App.4th at pp. 1355-1356.)
We take a moment to briefly discuss preemption because, as did the plaintiffs in Laidlaw and Bame, San Francisco and the dissent conflate principles of preemption with the doctrine exempting state entities from local regulation. “ ‘Under article XI, section 7 of the California Constitution, ‘“[a] county or city may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general [state] laws.” [¶] ‘“If otherwise valid local legislation conflicts with state law, it is preempted by such law and is void.” [Citations.] [¶] ‘“A conflict exists if the local legislation ‘ ‘“duplicates, contradicts, or enters an area fully occupied by general law, either expressly or by legislative implication.” ’ ” ’ ” (O’Connell v. City of Stockton (2007) 41 Cal.4th 1061, 1067 [63 Cal.Rptr.3d 67, 162 P.3d 583], italics omitted.) The consequence of the preemption of a local measure is that the measure is unenforceable against anyone. In contrast, the consequence of the application of the doctrine exempting state entities from local regulation is that the measure is unenforceable only against state entities. Thus, the law governing preemption has little to do with the doctrine exempting state entities from local regulation. Preempted local measures are unenforceable against state entities because they are void, not because of anything having to do with these entities’ governmental status.
Until our state Supreme Court stepped in, some appellate courts had treated charter cities’ tax measures as different from, and weightier than, other regulatory measures in considering whether they were unenforceable against anyone because they conflicted with, and were therefore preempted by, state law. (California Federal, supra, 54 Cal.3d at pp. 13-14.) California Federal rejected this distinction and held that both types of measures, tax and nontax, are subject to the same preemption analysis, which requires courts to focus on whether an actual conflict exists between the local measure and the state’s governance in the field. (Id. at p. 7.) The court explained, ‘“In the event of a true conflict between a state statute reasonably tailored to the resolution of a subject of statewide concern and a charter city tax measure, the latter ceases to be a ‘municipal affair’ to the extent of the conflict and must yield.” *1119 (Ibid.) The heart of California Federal’s holding was that a charter city’s measure, whether tax related or regulatory in some other sense, is void under the law of state preemption only if it truly conflicts with state law. Since California Federal, courts reviewing a charter city’s measure to determine whether it is preempted consider the extent to which it conflicts with state law, regardless of whether the measure is tax related.
The two main cases that San Francisco relies on in urging us to adopt the distinction between tax-related and other local measures are Court of Appeal decisions announced before California Federal and involving circumstances far different than those presented here. Oakland Raiders v. City of Berkeley (1976) 65 Cal.App.3d 623 [137 Cal.Rptr. 648] involved a Berkeley ordinance requiring private businesses to pay a gross-receipts tax. (Id. at p. 626.) The Court of Appeal held that this tax could be imposed on a private business even though the business leased property from the University of California. Referring to the pre-California Federal distinction between tax and other local measures, the court stated that “ ‘[wjhether or not the state law has occupied the field of regulation, cities may tax businesses carried on within their boundaries,’ ” including a business that is a “lessee of publicly owned property.” (Id. at pp. 626-627.) Similarly, City of Los Angeles v. A.E.C. Los Angeles (1973) 33 Cal.App.3d 933 [109 Cal.Rptr. 519] authorized a charter city, Los Angeles, to impose a gross-receipts tax on a private business that was performing contract work for the state because there was no “state statutory scheme which preempted] the area of taxation in which the City business tax operate[d].” (Id. at pp. 939-940.) The holdings in these cases do not apply to the case at hand. The issue here is whether the universities are exempt from collecting and remitting the parking tax, not whether third parties can avoid the tax by virtue of their business relationship with the universities or principles of state preemption.
In arguing that charter cities’ power to tax under the home-rule provision authorizes charter cities to require state entities to collect and remit taxes, San Francisco and the dissent also rely on an alternative rationale used by the Court of Appeal in reaching its holding in the decades-old case of City of Modesto, supra, 34 Cal.App.3d 504. In our view, that reliance is misplaced. In City of Modesto, Modesto, a charter city, imposed a tax on users of water, gas, electricity, and telephone services and required providers of those services to collect the tax. (Id. at p. 506.) As a consequence, the city sought to compel two state irrigation districts that sold electricity to city users to collect the tax. (Id. at pp. 505-506.) Although the districts conceded that the city had the power to impose the local tax on its residents, they claimed that they were not required to collect those taxes because if that power were “extended to state agencies, [it would] contravene[] the almost universal *1120 rule . . . that the activities of the state and its agencies cannot be controlled or regulated by local entities in the absence of legislative consent.” {Id. at p. 506.)
The Court of Appeal first determined that the irrigation districts were not exempt from the city’s regulation because our state Supreme Court had previously held, in two separate cases, that (1) irrigation districts selling electricity on the open market are engaged in a proprietary activity and (2) an ordinance requiring a utility to collect a city tax on users is not invalid under preemption principles because it does not “ ‘constitute forbidden or conflicting regulation of the utility.’” (City of Modesto, supra, 34 Cal.App.3d at p. 506; see Rivera v. Fresno (1971) 6 Cal.3d 132, 139 [98 Cal.Rptr. 281, 490 P.2d 793]; Yolo v. Modesto Irrigation Dist. (1932) 216 Cal. 274, 278 [13 P.2d 908].) If both of these propositions were true, the Court of Appeal asked, ‘“how can it be argued plausibly that the collection requirement of [Modesto’s] ordinance, if applied to that proprietary activity, is regulation which impinges on the state’s sovereignty?” (City of Modesto, at p. 507.) This analysis, to which we subscribe, comports with Hall by recognizing that state entities engaged in proprietary activities are subject to local regulation.
But City of Modesto went on to offer an alternative rationale in support of its holding that does not comport with Hall and to which we do not subscribe. In this alternative rationale, the Court of Appeal explained that a charter city’s power to ‘“levy a utility users’ tax is a municipal affair and stems from the Constitution” and carries with it the ‘“the corollary power to use reasonable means to effect [the tax’s] collection.” (City of Modesto, supra, 34 Cal.App.3d at p. 508.) The court then determined that Modesto’s constitutionally grounded powers took precedence over the irrigation districts’ statutorily grounded state sovereignty, stating, “It is . . . basic that if there is a conflict between the California Constitution and a law adopted by the Legislature, the California Constitution prevails. While irrigation districts may be state agencies, they are nevertheless creatures of the Legislature, and like the Legislature must submit to a constitutional mandate; the California Constitution is the paramount authority to which even sovereignty of the state and its agencies must yield. It follows that the collection requirement of [Modesto’s] ordinance, though applicable to state agencies, is a reasonable exercise of [Modesto’s] constitutional power to tax for revenue purposes.” {Ibid.) This rationale, in other words, was premised on the notion that a charter city’s constitutional authority under the home-rule provision should be weighed against and take precedence over statutory authority conferred on a state entity.
Laidlaw and Bame squarely, and in our view properly, rejected this premise. As those two decisions explained, what matters is not the source of a *1121 local agency’s authority, but instead whether, under Hall’s analytical framework, the state entity is engaged in a governmental activity and whether consent to local regulation has been conferred by a statute or constitutional provision. (Bame, supra, 86 Cal.App.4th at pp. 1355-1356; Laidlaw, supra, 43 Cal.App.4th at pp. 638-639.) City of Modesto’s alternative rationale exacerbated the error of focusing on the source of the city’s authority, i.e., the home-rule provision, by then weighing that authority against the state entities’ statutory authority. We have found no other cases that have taken such an approach, and we decline to adopt it here.
Furthermore, even if we were to accept the alternative rationale’s premise that a city’s constitutional authority trumps a state entity’s statutory authority, we still would not be compelled to sanction San Francisco’s effort to impose the ordinance’s requirements on the universities. The irrigation districts’ authority in City of Modesto was based on statutes, but the universities’ authority here is derived from the Constitution. Thus, even if the proper analysis did involve a weighing of the local agency’s authority against the state entity’s authority, we would not necessarily conclude that San Francisco’s constitutional authority trumps the universities’ constitutional authority.
We are similarly unimpressed with dicta in Eastern Mun. Water Dist. v. City of Moreno Valley (1994) 31 Cal.App.4th 24 [36 Cal.Rptr.2d 823], upon which both San Francisco and the dissent rely. In Moreno Valley, the Court of Appeal permitted a noncharter city to require a municipal water district—i.e., a nonstate entity—to collect and remit a utility tax after determining that the district had waived any sovereign immunity that it might possess. (Id. at pp. 25, 30.) The court did not need to go any further to conclude that the district was therefore subject to the city’s regulation. Nevertheless, after noting that the district’s sole argument was that the city, a general law city, “lacked the statutory authority” to require the district to collect the tax, the court referred to City of Modesto’s alternative rationale in remarking that the “ ‘power to tax carries with it the corollary power to use reasonable means to effect its collection’ ” regardless of the source of that power. (Id. at pp. 28-30.) This passage has no bearing on the case before us. While we have no quarrel with the principle that a city’s authority to impose a tax generally carries with it the corollary power to collect the tax, that principle has nothing to do with whether any such corollary power can be used to force a state entity to collect and remit local taxes against its will when it is engaged in a governmental activity.[3] Moreno Valley did not involve a *1122 comparison of the source of a city’s authority with the source of a state entity’s authority. Just because a city has the general power to collect a tax does not mean it has the power to force a state entity to collect that tax on the city’s behalf.
Finally, we recognize that in Weekes our state Supreme Court mentioned the state’s participation in collecting and remitting certain local taxes. There, taxpayers challenged an “ ‘employee license fee’ ” that Oakland, a charter city, imposed on people who worked in the city for the “ ‘privilege of engaging in or following any business, trade, occupation or profession as an employee.’ ” (Weekes, supra, 21 Cal.3d at pp. 390.) “Although the employee [was] the actual taxpayer, . . . employers [were required] to collect the license fee by withholding tax from each employee’s paycheck.” (Id. at p. 391.) At the end of its opinion, after rejecting the taxpayers’ contention that the fee was “essentially a municipal income tax” prohibited by statute, the court commented that Oakland was “not barred from imposing its license tax upon state employees who work within the city.” (Id. at pp. 390, 398.)
In our view, the dissent reads far too much into this comment. As support for the remark, Weekes cited only Graves v. N. Y. ex rel. O’Keefe (1939) 306 U.S. 466, 486-487 [83 L.Ed. 927, 59 S.Ct. 595] (Weekes, supra, 21 Cal.3d at p. 398), in which the United States Supreme Court held that federal employees were not immune from state income tax because there was no “basis for the assumption that any . . . tangible or certain economic burden is imposed on the government ... as would justify a court’s declaring that the taxpayer is clothed with the implied constitutional tax immunity of the government by which he [or she] is employed.” (Graves, at p. 486.) Thus, Weekes’s comment addressed whether state employees might be charged the license tax, not whether the state was exempt from local regulation or could instead be forced to collect and remit those taxes. Weekes is silent on the effect of the doctrine exempting state entities from local regulation, and “ ‘it is axiomatic that cases are not authority for propositions not considered.’ ”[4] (Sonic-Calabasas A, Inc. v. Moreno (2013) 57 Cal.4th 1109, 1160 [163 Cal.Rptr.3d 269, 311 P.3d 184].)
In conclusion, although San Francisco has broad powers under the home-rule provision, including the power to tax, the doctrine exempting state entities from local regulation prevents San Francisco from forcing the universities to collect and remit city taxes imposed on users of the universities’ parking facilities. Unlike the dissent, we do not consider the law in this *1123 area to be in a state of disarray, and we see no need to craft a judicial exception to the doctrine. While there may be a value in having state entities collect and remit charter city taxes, the doctrine incorporates readily available methods to implement any such value: state entities can voluntarily collect and remit those taxes, or the Legislature can tell them they must.
III. Disposition
The judgment is affirmed. The parties shall bear their own costs on appeal.
Margulies, J., concurred.

 For years, appellate courts have described this doctrine as an extension of “sovereign immunity,” but in our view this description risks creating confusion. Sovereign immunity typically refers to a limit on the ability to recover money damages, which means it is inapplicable to claims, such as those here, seeking equitable relief against state entities. (See Western Title Guar. Co. v. Sacramento & San Joaquin Drainage Dist. (1965) 235 Cal.App.2d 815, 823-824 [45 Cal.Rptr. 578].) The term also typically refers to the government’s immunity from suits brought by those who are governed, or who are at least outside of the governmental structure. (See Muskopf v. Corning Hospital Dist. (1961) 55 Cal.2d 211, 214, fn. 1 [11 Cal.Rptr. 89, 359 P.2d 457].) This suit satisfies neither of these elements: it does not seek money damages, and it is an internal state governmental dispute. While the doctrine at issue here involves a type of governmental immunity, the law that governs in typical sovereign-immunity contexts is largely inapplicable.

 The parties dispute whether San Francisco is seeking to compel the universities to comply with the ordinance’s administrative requirements other than the obligations to collect and remit the city parking taxes. We need not resolve this dispute in light of our conclusion that the universities are exempt from complying with the ordinance. Still, we are not as convinced as the dissent seems to be that the burdens San Francisco seeks to impose are necessarily “minimal” or that the universities “will bear no costs of collection.” (Dis. opn., post, at p. 1149.)

 San Francisco and the dissent also rely on an opinion by the Attorney General (65 Ops.Cal.Atty.Gen. 267 (1982)) that cited City of Modesto’s alternative rationale in concluding that a charter city could require an agent of the state to collect a local occupancy tax. We reject the opinion’s reasoning because it also fails to acknowledge the distinction between a charter city’s power to impose a local tax and its power to force a state entity to collect that tax.

 We are similarly not persuaded by the dissent’s discussion of federal cases involving the federal government, states, and Indian tribes that permit the imposition of a “minimal burden” related to taxes. These cases have nothing to do with the California-law doctrine exempting state entities from local regulation, and there is no reason to look to them for guidance.