# IN THE SUPREME COURT OF CALIFORNIA

CITY AND COUNTY OF SAN FRANCISCO,
Plaintiff and Appellant,

v.

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA et al.,
Defendants and Respondents.

S242835

First Appellate District, Division One
A144500

San Francisco City and County Superior Court
CPF-14-513-434

June 20, 2019

Justice Kruger authored the opinion of the court, in which Chief Justice Cantil-Sakauye and Justices Chin, Corrigan, Liu, Cuéllar, and Baker* concurred.

---

* Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

The City and County of San Francisco (San Francisco) imposes a tax on drivers who park their cars in paid parking lots. To enforce the tax, the city requires parking lot operators to collect the tax from drivers and remit the proceeds to the city. We granted review to consider whether the California Constitution permits San Francisco to apply this tax collection requirement to state universities that operate paid parking lots in the city. We conclude the answer is yes.

**I.**

San Francisco is a consolidated city and county that has adopted a charter for its own governance under article XI, section 3 of the California Constitution. Exercising its constitutional power to regulate its "municipal affairs" as a charter city (Cal. Const., art. XI, § 5, subd. (a)), in the early 1970's San Francisco enacted a tax on the cost of "rent" for any parking space at a parking lot or garage in the city. (S.F. Bus. & Tax Regs. Code, art. 9, § 601.) Since 1980, the parking tax rate has been set at 25%. (*Id.*, § 602.5.)

The San Francisco parking tax is imposed on drivers. But like many taxes of its kind, the parking tax is not paid directly to the city; drivers instead pay the parking tax to the parking lot operator, along with the parking fee the operator charges. The operator then collects the taxes and remits them to the city. (S.F. Bus. & Tax Regs. Code, art. 9, § 603.) To ensure it receives the proper amounts, San Francisco

requires operators to document the taxes they collect and holds them liable for any underpayments.[1]

By its terms, the ordinance applies to public entities and private ones alike, though it does excuse public entity operators from some of the requirements imposed on private parking operators, such as

---

[1] To be more specific: The ordinance generally requires the operator to file quarterly tax returns that document the amount of the parking tax to be remitted, and such other information as the city may require. (S.F. Bus. & Tax Regs. Code, art. 6, § 6.7-2, subd. (c).) The operator must also certify in writing, under penalty of perjury, that it has utilized machines that record all parking transactions to the city's specifications. (*Id.*, art. 9, § 607, subd. (b); *id.*, art. 22, § 2203.)

If an operator does not collect the tax from drivers renting parking space in its facilities, the operator becomes liable to the city for the amount of the tax. (S.F. Bus. & Tax Regs. Code, art. 9, § 604, subd. (a).) The city will excuse the operator from remitting tax on a small percentage of lost or unaccounted-for tickets, but operators are otherwise generally liable for the full value of the highest maximum daily rate charged for any lost or unaccounted-for ticket. (*Id.*, subd. (b).) The city may consider "in its sole and absolute discretion" whether an operator's explanation for lost tickets or canceled transactions is reasonable. (*Id.*, subd. (c).)

The operators' compliance with these requirements is backed by the threat of more significant sanctions. Under San Francisco law, operators must post a bond and obtain a certificate of authority in order to operate a parking lot. (S.F. Bus. & Tax Regs. Code, art. 6, § 6.6-1.) If an operator violates any city rule or regulation related to the parking tax, "including but not limited to any failure to timely collect, report, pay, or remit any tax imposed by this Code, failure to maintain accurate registration information, failure to sign any return or pay any tax when due, or failure to timely respond to any request for information," then the operator's certificate of authority may be suspended or revoked. (*Id.*, subd. (g).)

bonding and permitting requirements (S.F. Bus. & Tax Regs. Code, art. 6, § 6.6-1, subd. (h)(2); S.F. Police Code, art. 17, § 1215, subd. (b)), and requirements for installing devices to properly track parking revenue and taxes (S.F. Bus. & Tax Regs. Code, art. 22, § 2202). But public entities are still required to "collect, report, and remit" the parking tax owed by drivers to the city (S.F. Bus. & Tax Regs. Code, art. 6, § 6.8-1, subd. (b)). It is this requirement that has generated the present controversy.

Defendants are the Regents of the University of California (Regents), which oversees the University of California at San Francisco (UCSF); the Board of Directors of Hastings College of the Law (Hastings); and the Board of Trustees of the California State University (CSU), which operates San Francisco State University (SFSU) (collectively, the universities). All of the university defendants own and operate private parking facilities in San Francisco in order to serve the needs of their respective campuses. Specifically, the Regents own and operate parking facilities at UCSF's educational and healthcare facilities for the use of faculty, staff, students, researchers, visitors, and patients who receive care at the clinics and hospitals on campus. UCSF uses its parking fee revenue to fund, among other things, a shuttle bus service between its various locations for students, faculty, and staff. Hastings operates a garage near its law school, which is located in the Tenderloin neighborhood of San Francisco. Hastings explains that it operates the garage at a loss in order to maintain a safe and secure environment for its students. CSU, for its part, operates nine parking lots on SFSU's campus, which is located in an urban environment where parking is scarce.

In 1983, San Francisco attempted to collect parking lot taxes from UCSF, but the Regents asserted immunity and San Francisco declined to pursue the matter. That was, for quite some time, the end of the controversy. But in 2011, San Francisco reconsidered and directed UCSF, Hastings, and SFSU to begin collecting and remitting the parking tax. The universities refused. In response, San Francisco filed a petition for a writ of mandate in the trial court to compel compliance. San Francisco argued that it would be a minimal burden for the universities to collect the parking tax along with whatever parking fees they charge. San Francisco also offered to reimburse the universities for their administrative costs in collecting and remitting the taxes, as the trial court had ordered in another municipal tax collection case, *City of Modesto v. Modesto Irrigation Dist.* (1973) 34 Cal.App.3d 504, 508–509 (*City of Modesto*). The trial court denied the writ, concluding that the universities are exempt from compliance with the parking tax ordinance. The trial court reasoned that this result followed from the constitutional principles articulated and applied in *In re Means* (1939) 14 Cal.2d 254 (*Means*) and *Hall v. City of Taft* (1956) 47 Cal.2d 177 (*Hall*), which hold that a local government may not regulate a state entity in its performance of governmental functions unless the state consents to the regulation.

The Court of Appeal affirmed in a published opinion, agreeing with the trial court that the *Means-Hall* doctrine exempts the state agencies from collecting and remitting the parking tax. (*City and County of San Francisco v. Regents of University of California* (2017) 11 Cal.App.5th 1107 (*City and County of San Francisco*).)

Justice Banke dissented. In her view, the state's sovereignty is "not impinged" (*City and County of San Francisco, supra*, 11 Cal.App.5th at p. 1149 (dis. opn. of Banke, J.)) by the "minimal

burden" (*ibid.*) of "collecting a general local tax imposed on third parties, particularly where the costs of such are reimbursed" (*id.* at p. 1146). She also observed that other authorities have, contrary to the majority's holding, concluded that a municipality may require a state entity to collect a general tax imposed on third parties doing business with the entity, at least where the municipality reimburses the state entity for the costs of collection. (See *City of Modesto, supra,* 34 Cal.App.3d 504 [charter city could require state agency operating as utility to collect utility user's tax]; *Eastern Mun. Water Dist. v. City of Moreno Valley* (1994) 31 Cal.App.4th 24, 26 (*City of Moreno Valley*) [relying on *City of Modesto* to conclude general law city could require state agency operating as utility to collect utility user's tax]; accord, 65 Ops.Cal.Atty.Gen. 267 (1982) [relying on *City of Modesto* to conclude municipality may require state agency to collect local occupancy tax from private users of state conference center].) While the law on the subject "has been far from a paragon of clarity," she argued, the majority's decision left the law "in some disarray." (*City and County of San Francisco,* at p. 1124 (dis. opn. of Banke, J.).) She called on this court to "state clearly whether or not a state entity can be asked to collect a local tax imposed on third parties doing business with the entity, particularly where . . . the entity will be reimbursed its costs of doing so." (*Ibid.*)

Hearing the call, we granted review.

## II.

The general problem in this case is familiar to any constitutional system in which two governments exercise authority within the same territory. The specific task before us is to determine the proper allocation of authority between a local government and state agencies under a constitution that confers substantial powers on each.

Many of California's local governments predate California's statehood, and the framers of the 1879 California Constitution dedicated an entire article to the subject of their powers. From the outset, the 1879 Constitution expressly recognized the police powers of local government, and continues to do so today: As relevant here, any city "may make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) The 1879 Constitution also permitted cities of a certain size to adopt charters for their own government. (*Weekes v. City of Oakland* (1978) 21 Cal.3d 386, 399 (*Weekes*), citing Cal. Const., art. XI, §§ 6, 8 (1879).) In 1896, voters approved a so-called "home rule" provision granting charter cities "supremacy over local matters." (*Weekes*, at p. 399.) This provision, as presently written, permits charter cities to "make and enforce all ordinances and regulations in respect to municipal affairs"; with respect to such matters, the cities' charters "supersede all laws inconsistent therewith." (Cal. Const., art. XI, § 5, subd. (a).)[2]

---

[2]   Charter counties also enjoy home rule authority. (See Cal. Const., art. XI, § 3 [County charters "shall supersede . . . all laws inconsistent therewith."].) This authority, however, is more limited than that of charter cities; the Constitution contains no provision giving charter counties supreme authority over " 'county affairs.' " (*Dibb v. County of San Diego* (1994) 8 Cal.4th 1200, 1207–1208.) San Francisco, as California's only consolidated city and county, enjoys the greater degree of autonomy that comes with charter city status. (Cal. Const., art. XI, § 6, subd. (b).)

This home rule authority includes the power to tax for local purposes.[3] The power to tax, we have explained, is the lifeblood of the charter city; without it, "the municipality cannot exist, and the municipality alone is directly concerned in its preservation." (*Ex parte Braun* (1903) 141 Cal. 204, 210.) It is this local taxation power that San Francisco, a charter city, asserts here.

The universities in this case are agencies of the state government whose powers and responsibilities are defined in the Constitution, as well as in statutory law enacted by the Legislature. The Constitution itself establishes the University of California, vesting the Regents with "full powers of organization and government" (Cal. Const., art. IX, § 9, subd. (a)), including "the legal title and the management and disposition of the property of the university and of property held for its benefit" (*id.*, subd. (f)), and "all the powers necessary or convenient for the effective administration of [the University of California]" (*ibid.*). Hastings is statutorily designated as the law department of the University of California (Ed. Code, § 92201), and is charged with "afford[ing] facilities for the acquisition of legal learning in all branches of the law" (*id.*, § 92202).

The CSU system, too, finds explicit mention in the California Constitution, which refers to the Legislature's authority to create a "state agency . . . in the field of public higher education which is charged with the management, administration, and control of the

---

[3]     By statute, the Legislature has conferred a parallel taxation power on "general law" cities—that is, cities that have not adopted a charter under article XI, section 3 of the California Constitution. (Gov. Code, § 37100.5.) We do not consider today whether this power is coincident with charter cities' constitutional authority.

State College System of California." (Cal. Const., art. XX, § 23.) Exercising that authority, the Legislature has conferred on CSU a variety of powers, including the power "to acquire . . . real property and to construct, operate, and maintain motor vehicle parking facilities and other transportation facilities thereon for state university officers, employees, students, or other persons." (Ed. Code, § 89701, subd. (a); see generally *id.*, §§ 66600 et seq., 89000 et seq.) The Board of Trustees may also prescribe the "terms and conditions of the parking, . . . including the payment of parking fees" (*id.*, § 89701, subd. (a)), which it has done through regulation (Cal. Code Regs., tit. 5, § 42201).

San Francisco contends that its power to raise municipal revenue through taxation permits it to apply its tax ordinance to paid university parking lots within San Francisco borders, just as it applies the ordinance to other paid parking lots operated by private entities. The universities, on the other hand, argue that their status as agencies of the sovereign state government, engaged in duties assigned to them by state law and addressing matters of statewide importance, places private parties' use of their paid parking lots beyond the reach of San Francisco's revenue power. No provision of the state Constitution expressly resolves this controversy; the parties thus rely primarily on inferences from constitutional structure and this court's precedent resolving other types of intergovernmental conflicts. To answer the question, we must disentangle two separate threads of the inquiry. First, does San Francisco have the power to tax drivers who use paid university parking lots? Second, if so, may San Francisco enlist the universities' help in collecting and remitting the taxes?

## III.

We begin with the first issue, which goes to the substantive validity of the parking tax. The answer follows from settled precedent. As we have described it, the tax in question is not imposed on the state universities or their property. It is, rather, imposed on private parties—namely, drivers who use parking lots. This is a critical distinction. Since the days of *M'Culloch v. State of Maryland* (1819) 17 U.S. 316, it has been understood that the law forbids one government from imposing a tax on another. But it is also understood that the law does not forbid a government from imposing a tax on private third parties who happen to do business with another government (provided, that is, the tax does not discriminate against the parties *because* they are doing business with the government). (E.g., *Weekes, supra,* 21 Cal.3d at p. 398, citing *Graves v. N. Y. ex rel. O'Keefe* (1939) 306 U.S. 466, 486–487 (*Graves*).) The parking tax here, which applies to drivers in precisely the same way regardless of whether they use the university parking lot or a private parking lot across the street, belongs to this second category of taxes. There is no assertion here that the drivers here stand in the shoes of the universities themselves. Principles of governmental tax immunity do not bar the parking tax.

The universities do not take direct aim at this settled understanding of the limits of governmental tax immunity or their application to this case; the primary focus of their challenge to San Francisco's ordinance is, rather, the requirement that they play a role in collecting and remitting the taxes. Nevertheless, the universities raise a series of objections to San Francisco's tax ordinance that can only be understood as indirect challenges to San Francisco's power to impose the parking tax on the third parties who pay for use of

university parking lots. CSU, for example, contends that it should not be required to collect the parking tax because parking is of particular importance to the university and the tax threatens to interfere with CSU's educational mission by making parking more expensive. It explains that parking for SFSU students, staff, and visitors is scarce; adding a parking tax would make it difficult for CSU to ensure parking remains affordable; and CSU would lose revenue if it reduced its parking prices by the amount of the tax. The other universities raise similar concerns about interference with their judgments about how to provide affordable access to their facilities and the downstream impact on their budgets; indeed, Hastings adds that it considers parking so important that it already operates its garage at a loss.

Although the universities offer these arguments in service of their arguments for avoiding collection of San Francisco's parking tax, their true target is plainly the tax itself. If San Francisco's parking tax ordinance interferes with their judgments about how best to provide affordable access for guests and affiliates, it is because of San Francisco's chosen tax rate as applied to the third parties who park in university lots, not because of the requirement that parking lot operators collect these taxes along with other parking charges.

The answers to this set of objections, however, also follow from settled precedent. Our cases have made clear that a particular private activity may be a matter of particular concern to the state and nonetheless subject to municipal taxation. Even when the state has exclusive regulatory authority in a particular area, a local tax on the conduct of the regulated activity, without more, is not an impermissible " 'interference with state affairs.' " (*In re Groves* (1960) 54 Cal.2d 154, 157, quoting *In re Galusha* (1921) 184 Cal. 697

[municipality may tax attorney engaged in practice of law, notwithstanding exclusive state regulation of legal practice].)

Our cases have also held that it is permissible for a municipality to tax such private activities even though the tax imposes an indirect economic burden on the state government. General taxes on government employees and contractors are prime examples. In *Weekes*, *supra*, 21 Cal.3d 386, for example, this court upheld the application of a municipal occupation tax to state workers notwithstanding the clear, if indirect, impact on the state's choices regarding employee compensation. Similarly, in *City of Los Angeles v. A.E.C. Los Angeles* (1973) 33 Cal.App.3d 933 (*A.E.C. Los Angeles*), the Court of Appeal upheld the application of city business taxes to a state contractor, calculated on the basis of the gross receipts the contractor had obtained from the state. The court in *A.E.C. Los Angeles* explained that while "local ordinances may not impose a regulatory scheme upon private persons which operates to impinge upon the sovereign power of the state . . . revenue measures of general application imposing a nondiscriminatory tax upon persons doing business in a state regulated activity or with the state, do not so impinge." (*Id.* at p. 940, citations omitted.) This is so, the court explained, even when the economic burden can be passed on to a "higher governmental unit," thus indirectly affecting its operations. (*Ibid.*)

In elaborating these principles, these cases drew on a body of federal case law applying similar principles to uphold similar taxes imposed by state governments on federal employees and contractors. (See *Weekes*, *supra*, 21 Cal.3d at p. 398; *A.E.C. Los Angeles*, *supra*, 33 Cal.App.3d at p. 940.) In *Graves*, for example, the United States Supreme Court upheld a state tax on federal employees' income,

rejecting the argument that the resulting burden on the federal government is "tantamount to an interference by one government with the other in the performance of its functions." (*Graves*, *supra*, 306 U.S. at p. 481.) The high court has likewise upheld state taxes even when the levy effectively draws from the public treasury, as under cost-plus contracts that pass the entirety of the tax onto the federal government (see *United States v. Boyd* (1964) 378 U.S. 39, 46–47; *Alabama v. King & Boozer* (1941) 314 U.S. 1, 8 (*King & Boozer*)), or other contracts under which the taxes are paid with federal monies (see *United States v. New Mexico* (1982) 455 U.S. 720, 741–743 (*New Mexico*)).

The relationship between the federal and state governments is by no means identical to the relationship between state universities and charter cities. But the federal cases nevertheless offer several important lessons that have proved influential in our own case law. The federal cases recognize that "inferior" governments may levy taxes on private parties, even if the economic burden of that tax is passed entirely to the "superior" government. That this economic burden may make it more expensive for the superior government to perform its mission does not create an immunity from taxation—even when the mission is as critical as managing national railroads (*Railroad Company v. Peniston* (1873) 85 U.S. 5, 33), locks and dams on navigable rivers (*James v. Dravo Contracting Co.* (1937) 302 U.S. 134), army camps (*King & Boozer*), atomic energy plants (*Boyd*), or atomic laboratories (*New Mexico*). The cases reason that our federalist system is structured with overlapping governmental jurisdictions, and each level of government must be able to raise revenue from the constituents who benefit from its services—even though this taxation will inevitably impose indirect economic costs on

12

other governments operating within that jurisdiction. This is "but a normal incident of the organization within the same territory of two independent taxing sovereignties." (*King & Boozer, supra,* 314 U.S. at p. 9.)

California cases adopting this general view have not been limited to the realms of employment or contracting. For example, in *Board of Trustees v. City of Los Angeles* (1975) 49 Cal.App.3d 45 (*Board of Trustees*), the court upheld a municipal permitting requirement as applied to a circus held on CSU property. The court noted the ordinance would affect CSU "only in whatever manner enforcement might affect the revenue production" of the property, which was insufficient to bar the tax under preemption or sovereign immunity principles. (*Id.* at p. 49.) And in *Oakland Raiders v. City of Berkeley* (1976) 65 Cal.App.3d 623 (*Oakland Raiders*), the court upheld a city gross receipts tax on the Oakland Raiders for professional football games played in California Memorial Stadium at the University of California, Berkeley. The court acknowledged "the University of California is not subject to local regulations with regard to its use or management of the property held by the Regents in public trust." (*Id.* at p. 626.) Nonetheless, the court concluded, "[a] tax upon the operation of a business by a lessee of publicly owned property constitutes a tax upon the privilege of performing the business rather than a tax upon the property." (*Id.* at p. 627.) And " 'where it merely appears that one operating under a government contract or lease is subjected to a tax with respect to his profits on the same basis as others who are engaged in similar businesses, there is no sufficient ground for holding that the effect upon the Government is other than indirect and remote. . . .' [citation]; the fact that a tax may constitute

an indirect burden upon an organ of government does not invalidate the tax." (*Ibid.*)

The only municipal tax case in which we have invalidated a city's assertion of the power to tax parties regulated by or doing business with the state is *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1991) 54 Cal.3d 1 (*California Federal*). Not surprisingly, the universities rely heavily on *California Federal*, but it does not help them. In *California Federal*, we held that a state statute imposing a tax on banks and financial corporations in lieu of all other taxes and licenses preempted a municipal business tax that the City of Los Angeles, a charter city, sought to collect from a savings and loan association operating within its jurisdiction. The core of the ruling concerned the conflict between the municipal tax and the state taxation law, which had been designed to displace all other taxation laws. (*Id.* at pp. 18–19.) We explained that although taxation is a "necessary and appropriate power of municipal government, aspects of local taxation may under some circumstances acquire a 'supramunicipal' dimension, transforming an otherwise intramural affair into a matter of statewide concern warranting legislative attention." (*Id.* at p. 7.) "In the event of a true conflict between a state statute reasonably tailored to the resolution of a subject of statewide concern and a charter city tax measure, the latter ceases to be a 'municipal affair' to the extent of the conflict and must yield." (*Ibid.*)

This case involves no similar conflict between the Legislature's resolution of a matter of statewide concern and a charter city tax measure; the Legislature has enacted no overriding statutory regime designed to displace municipal parking taxes as applied to university

students, staff, or other guests.[4]   CSU, pointing to the unique
provisions of its governing statute, does argue that the Legislature
impliedly displaced San Francisco's parking tax by giving CSU the
power to build parking facilities (Ed. Code, § 89701, subd. (a)), and
giving the Board of Trustees the power to prescribe "the payment of
parking fees in the amounts and under the circumstances determined
by the trustees" (*ibid.*).   But the argument is unpersuasive; San
Francisco's tax does not hinder CSU's ability to build parking facilities
or charge the fees of its choice, any more than the municipal licensing
tax at issue in *Weekes* hindered the state employer's ability to hire
employees or set the salary of its choice.  We discern no "true conflict"
that would require the tax measure to yield.  (*California Federal*,
*supra*, 54 Cal.3d at p. 7.)

To the extent CSU or the other universities argue San
Francisco's parking tax is impliedly preempted because it imposes an
economic burden that threatens interference with the universities'

---

[4]    The Regents argue that *California Federal* should be read for
the broader proposition that municipal tax measures applicable to
transactions with state agencies should be reviewed with the same
degree of scrutiny as substantive regulations of those transactions.
They rely for this argument on a sentence that reads:  "[C]harter city
tax measures are subject to the same legal analysis . . . as charter city
regulatory measures." (*California Federal, supra*, 54 Cal.3d at p. 7.)
But as the surrounding context makes clear, this sentence meant only
that charter city taxes are not "invariably," and thus uniquely,
"immune from state legislative supremacy" in the preemption context.
(*Id.* at p. 6.)  In other words, a charter city tax—like a charter city
regulation—may be preempted by a state statute in appropriate
circumstances.  But as we explain, there is no preemptive state statute
applicable to the circumstances of this case.

performance of their assigned duties, we have already explained that the law is to the contrary; indirect economic consequences alone are insufficient to invalidate a nondiscriminatory municipal tax on third parties doing business with the state or its agencies. This is, in substance, the same argument that was rejected in *Oakland Raiders*. And it is an argument inconsistent with the basic principles we applied in *Weekes*. Any municipal tax will produce economic ripples that reach every significant market participant. If state agencies could invalidate municipal taxes based on these indirect effects on their operations, little would be left of the city's revenue power. Rather than attempt to draw granular distinctions based on the degree to which a tax on third parties affects government operations, the law instead generally confers on municipal governments the power to tax third parties, provided the tax is nondiscriminatory—and provided the tax satisfies the test against which the validity of all taxes are judged, namely, that it bears the necessary " 'fiscal relation to protection, opportunities and benefits given.' " (*Weekes*, *supra*, 21 Cal.3d at p. 398.)

Applying these principles here, we conclude that the San Francisco parking tax ordinance is not invalid as applied to drivers who park in paid university parking lots even though the tax will have secondary effects on the universities. This conclusion in no way calls into question the genuineness or importance of the universities' interest in providing accessible parking to staff, students, and guests, while minimizing the impact on their own budgets. We instead conclude that such interests, important though they may be, are not a sufficient basis for setting aside a nondiscriminatory municipal tax where the legal incidence falls on private parties who do not actually

" 'stand in the Government's shoes.' " (*New Mexico, supra*, 455 U.S. at p. 736.)

To put the matter simply: Private parties transacting on state property may not appropriate to themselves the state's immunity from local taxation, and state agencies may not nullify local taxes on account of unfavorable secondary economic effects. (See *Oakland Raiders, supra*, 65 Cal.App.3d at p. 627; *Board of Trustees, supra*, 49 Cal.App.3d at p. 49; *A.E.C. Los Angeles, supra*, 33 Cal.App.3d at p. 940.) Affirming San Francisco's power to tax drivers who park in paid university lots does not answer whether San Francisco has the further power to order the universities to collect and remit those taxes. It does, however, sharpen the inquiry. If San Francisco has exceeded its authority, it is because there is something constitutionally improper about the particular burden of requiring state employees to perform tax collection on behalf of municipalities. We must evaluate this burden separately from the universities' opposition to the parking tax itself.

## IV.

We turn then, to the crux of the case before us: whether the California Constitution permits San Francisco to require the state university parking lot operators to collect the parking tax and remit the proceeds to the city.

As an initial matter, we note there is nothing unusual about San Francisco's general requirement that parking lot operators collect and remit the parking taxes on its behalf. Such arrangements are standard operating procedure in many areas of tax law. As this court observed decades ago: "The field of taxation is replete with examples of a government entity making businesses generally its agent in tax collections and prescribing certain regulations in the accounting

therefor . . . such as withholding taxes and social security taxes for the United States government, unemployment taxes and numerous excise taxes for the state—'a familiar and sanctioned device.' " (*Ainsworth v. Bryant* (1949) 34 Cal.2d 465, 477 (*Ainsworth*).)  When a governmental entity lays a tax on a particular type of transaction, it often tasks one party to the transaction with the duty to see the tax is paid.  Without such arrangements, a great many valid tax laws— including this one—would simply go unenforced.  (*Ibid.*)

What makes this case unusual is that one government has sought to impose such a requirement on another.  While governments have often agreed among themselves to lend such assistance (see, e.g., 5 U.S.C. § 5517 [authorizing federal employers to withhold state income taxes]; Rev. & Tax. Code, § 7204 [authorizing the State Board of Equalization to remit sales and use taxes collected on behalf of local governments]), here no such agreement has been reached.  The universities contend that principles of "hierarchical sovereignty" embodied in the California Constitution forbid a municipality from imposing any sort of requirement on the sovereign state or state agencies engaged in their assigned functions—including a requirement to collect and remit local taxes from users of their facilities—unless the state consents to the imposition.

The centerpiece of the universities' argument is a series of cases holding that otherwise legitimate exercises of municipal regulatory power cannot be enforced against state agencies engaged in pursuit of their constitutionally or statutorily assigned duties.  The line of cases begins with *Means*, *supra*, 14 Cal.2d 254, which concerned the constitutionality of applying a municipal plumber certification ordinance, which required plumbers to sit for examination and deliver a bond, against a state employee working on state property.  (*Id.* at

18

pp. 256–257.) We held the ordinance could not be constitutionally applied to the state employee, explaining that when setting qualifications for its employees, the state "acts in an exclusive field [citations], and is not subject to the legislative enactments of subordinate governmental agencies." (*Id.* at p. 258.) Thus, "[i]f one who has been employed by the state may not work on state property within a municipality without the consent of the municipality obtained after examination, the city has, in effect, added to the requirements for employment by the state, and restricted the rights of sovereignty." (*Ibid.*)

In so holding, *Means* outlined a set of general limits on a charter city's power over "municipal affairs." The rule, we explained, "is not entirely a geographical one. Under certain circumstances, an act relating to property within a city may be of such general concern that local regulation concerning municipal affairs is inapplicable." (*Means*, *supra*, 14 Cal.2d at p. 259.) For example, maintenance of city streets ceases to be a municipal affair if the Legislature designates a street as a secondary state highway; so, too, regulations that require construction to be overseen by local supervisors ceases to be a municipal affair once they are applied to state buildings. (*Ibid.*) In each example, the municipality's exercise of power results in a "direct conflict of authority." (*Id.* at p. 260.) "Upon fundamental principles," we concluded, "that conflict must be resolved in favor of the state." (*Ibid.*)

We addressed a similar issue in *Hall*, *supra*, 47 Cal.2d 177, in which we held that a school district organized under state laws was exempt from building regulations promulgated by a noncharted city. We explained that under the California Constitution, "[t]he public schools of this state are a matter of statewide rather than local or

municipal concern" (*id.* at p. 179); furthermore, we observed, the state has occupied the field of the construction of school buildings (*id.* at pp. 184, 188). Citing *Means*, we explained that, as a general rule, when the state "engages in such sovereign activities as the construction and maintenance of its buildings . . . it is not subject to local regulations unless the Constitution says it is or the Legislature has consented to such regulation." (*Hall*, at p. 183.) So, too, with the construction of school buildings by school districts that act as state agencies for the operation of the local school system. (*Ibid.*; see *id.* at p. 181.)

The Courts of Appeal have applied the principles articulated in *Means* and *Hall* to exempt state agencies from the regulatory reach of a wide array of local ordinances. In *City of Santa Ana v. Board of Ed. of City of Santa Ana* (1967) 255 Cal.App.2d 178 and *Laidlaw Waste Systems, Inc. v. Bay Cities Services, Inc.* (1996) 43 Cal.App.4th 630, for example, the courts held that school districts were exempt from local garbage collection regulations. In *City of Orange v. Valenti* (1974) 37 Cal.App.3d 240, the court held that the state unemployment insurance office did not have to comply with a local parking ordinance prescribing the number of parking spaces that must be available. (*Id.* at pp. 242–244.) In *Regents of University of California v. City of Santa Monica* (1978) 77 Cal.App.3d 130, 136–137, the court held the city could not enforce a construction fee against the Regents, because "the University of California is not subject to local regulations with regard to its use or management of the property held by the Regents in public trust."

This line of cases does not articulate quite as broad a rule as the universities suggest.[5] The cases concern substantive regulatory requirements that interfered with the state's substantive judgments about how to perform its assigned functions. *Means* and *Hall* tell us that in the event of a conflict between a municipality's view of, say, how best to build a parking lot, and the state's ability to decide for itself what sort of parking lot would best serve its needs, the state's prerogatives must prevail. But the *Means-Hall* cases do not hold that state agencies are categorically beyond the reach of any local law, no matter how inobtrusive, including one that does no more than require assistance in collecting a concededly valid tax on third parties. No such scenario was presented in those cases, and we did not answer the question.

---

[5] The Court of Appeal understood this line of cases to distinguish between municipal regulations that operate on state agencies in their performance of "proprietary" activities—which are permissible—and those regulations that instead operate on state agencies in their performance of "governmental functions." The court concluded that the operation of the parking lots in question is a "governmental" function, and for that reason deemed San Francisco's collection requirement unconstitutional as applied. (*City and County of San Francisco, supra,* 11 Cal.App.5th at p. 1114; see *Board of Trustees, supra,* 49 Cal.App.3d 45; *City of Modesto, supra,* 34 Cal.App.3d 504.) Although the parties continue to debate whether operation of paid parking lots is better described as a "proprietary" or a "governmental" function, both sides agree that the proper result in this case does not turn on this matter of characterization. We agree. Because this case does not require us to decide how the distinction between governmental and proprietary functions might inform our assessment of the state's interest, if at all, we decline to do so.

The universities' argument for an absolutist view of "hierarchical sovereignty" also draws on an intuition derived from federal constitutional law, where the high court has held that one sovereign—namely, the federal government—cannot conscript officials of another sovereign—state governments—for its own purposes. (See *Murphy v. National Collegiate Athletic* (2018) 584 U.S. ___ [138 S.Ct. 1461]; *Printz v. United States* (1997) 521 U.S. 898.) But it is not clear that even those cases, which concern the unique federalism principles embodied in the United States Constitution, are properly read to adopt a rule of categorical immunity from any and all ministerial requirements one government might impose on another. (See *Printz,* at p. 936 (conc. opn. of O'Connor, J.) [reserving question whether anticommandeering doctrine invalidates ministerial reporting requirements].)

And outside of the context of federal-state relations, the high court has concluded that one government—the state—does have the authority to require another government—an Indian tribe—to bear " 'minimal burdens' " in collecting any applicable state taxes on its behalf, even though the tribe is in no way answerable to the state. (*Oklahoma Tax Comm'n v. Chickasaw Nation* (1995) 515 U.S. 450, 459.)

Having exhausted the relevant precedent in this area, it remains to consider whether the structure of our state Constitution requires us to erect a rigid bar against the sort of intergovernmental tax collection assistance requirement at issue here. We conclude that it does not. In matters concerning the structural division of authority under our Constitution, we have generally avoided the type of absolutist approach the universities urge in favor of a more flexible one, capable of adaptation to the practical imperatives of governance.

22

(See, e.g., *People v. Bunn* (2002) 27 Cal.4th 1, 14 [recognizing that while our Constitution divides power among three coequal branches, "the branches share common boundaries [citation], and no sharp line between their operations exists. [Citations.] . . . [¶] Indeed, the 'sensitive balance' underlying the tripartite system of government assumes a certain degree of mutual oversight and influence. [Citations.]")

In questions concerning the division of authority between the state and charter cities, in particular, we have recognized the need to maintain a sensitive balance between competing prerogatives. In *California Federal*, we emphasized the fact- and circumstance-specific nature of the determination whether an ordinance governs a " 'municipal affair,' " (*California Federal*, *supra*, 54 Cal.3d at p. 17) over which charter cities maintain ultimate authority (Cal. Const., art. XI, § 5, subd. (a)), or a " 'statewide concern,' " which means the charter city measure must yield in the face of conflicting state interests (*California Federal*, at p. 17). "In cases presenting a true conflict between a charter city measure—whether tax or regulatory—and a state statute," we said, "the hinge of the decision is the identification of a convincing basis for legislative action originating in extramunicipal concerns, one justifying legislative supersession based on sensible, pragmatic considerations." (*California Federal*, at p. 18.) Courts may invalidate an otherwise valid charter city measure only where, "under the historical circumstances presented, the state has a more substantial interest in the subject than the charter city." (*Ibid.*) This state interest must be demonstrated through a "fact-bound justification," for deferring to the mere assertion of a state prerogative would " 'ultimately all but destroy municipal home rule.' " (*Ibid.*)

Here, too, we conclude that the constitutional task before us calls for a sensitive balancing of constitutional interests, rather than a simple invocation of constitutional rank. To be sure, this is not a preemption case like *California Federal*; we are not asking whether an ordinance that would otherwise represent a lawful exercise of the charter city's powers is invalid, either on its face or as applied, because the Legislature has claimed the relevant regulatory area exclusively for the state. But the basic task is similar. Here, much as in *California Federal*, we are called on to "adjust[] the political relationship between state and local governments in discrete areas of conflict." (*California Federal, supra*, 54 Cal.3d at p. 18.) Our emphasis on pragmatic balancing and factual context in the preemption analysis translates cleanly to the present dispute, and contradicts the kind of categorical, sweeping rule urged by the universities. A state agency's generalized offense at the notion of taking orders from a local government cannot alone be dispositive; we must consider and pragmatically weigh the substantive constitutional interests on both sides of the balance.

Here, on the state's side of the balance, we recognize the universities' objection rests on more than just generalized offense; they worry that if municipalities begin to impose legal requirements on them, their attention will inevitably be diverted from their missions. The concern is a legitimate one, but it bears emphasis that the case before us does not concern just any kind of legal requirement; it concerns a requirement to collect parking taxes along with the university's parking fees. Even so, we agree with the dissenting opinion in the Court of Appeal that "requiring a state entity to collect a local tax brings the respective sovereign spheres of the state and a municipality within harrowingly close proximity." (*City and County*

24

*of San Francisco*, *supra*, 11 Cal.App.5th at p. 1146 (dis. opn. of Banke, J.).)  But as a practical matter, the burdens associated with the particular tax-collection requirement at issue here are minimal.[6]  The only disruptions the universities have been able to identify with any specificity are the secondary economic effects that San Francisco's tax will impose on their parking operations.  As we have already explained, however, "the fact that a municipal tax is imposed in a fashion which permits its ultimate economic burden to be passed on to a higher governmental unit does not invalidate it."  (*A.E.C. Los Angeles*, *supra*, 33 Cal.App.3d at p. 940.)

On the other side of the balance, the city's interest in enforcing the collection requirement is considerable.  San Francisco has a legitimate interest in the millions of dollars in contested tax money, and a tax is effective only if it can be collected.  It is precisely for that reason that we have repeatedly held in other contexts that the power to tax includes the power to order steps necessary to collect the tax, including the recruitment of third parties who would otherwise be beyond the charter city's regulatory power.  In *Ainsworth*, *supra*, 34 Cal.2d 465, for example, a liquor retailer challenged San Francisco's sales tax, arguing it was inconsistent with a constitutional provision vesting the state with the exclusive power to regulate liquor within the state. (*Id.* at p. 468; see Cal. Const., art. XX, § 22.)  San Francisco's

---

[6]     And indeed, to avoid any question on the score, San Francisco has conceded that it may be required to reimburse the universities for their costs of collection and remittance.  While it is clear that there is no significant burden on a sovereign when these administrative costs are reimbursed, the parties have not asked us to decide whether the burden could be significant where reimbursement is not provided.

ordinance required the retailer to collect a sales tax from the purchaser at the time of sale, to register with the tax collector, to keep records, and to make quarterly returns. (*Ainsworth*, at pp. 468–469.) We held that the effect of the constitutional provision should not be extended to reduce "the plenary power of taxation possessed by a chartered municipality as an essential attribute of its existence." (*Id.* at p. 472.) Because the tax was a valid exercise of the city's authority, we further held that the collection, recordkeeping, and remittance requirements "appear reasonably adapted to insure the collection and proper remission of the tax, and as so premised, they constitute the maintenance of an accounting standard coincident with the city's taxing power rather than a regulation exclusively reserved to the state in the exercise of its police power over the liquor traffic." (*Id.* at p. 476.) The conclusion that a collection requirement is not a "regulation" reserved to the state, we said, "seems wholly clear when it is remembered that the city's power to levy such tax would include the power to use reasonable means to effect its collection." (*Ibid.*)

Similarly, in *Rivera v. City of Fresno* (1971) 6 Cal.3d 132, disapproved on other grounds by *Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, consumers sought to invalidate an ordinance requiring utility companies to collect and remit a municipal utility tax. (*Rivera*, at p. 135.) We held that the tax was consistent with the charter city's "home rule" powers, and was not preempted by the state's law regulating local sales and use taxes or its laws regulating public utilities. (*Id.* at pp. 135–136, 139–140.) "[W]hether or not the state has occupied the field of regulation," we said, "cities may levy fees or taxes solely for revenue purposes, as was done by the Fresno utility users' tax." (*Id.* at p. 139.) "Further, the requirement that the utility company supplying a particular utility

service collect the utility users' tax and remit to the city does not constitute forbidden or conflicting regulation of the utility." (*Ibid.*) Similar principles are in play here, though the subject of the collection requirement is a state agency rather than a private entity subject to exclusive state regulation.

This conclusion accords with the only appellate decision to consider this issue before the Court of Appeal decision in this case. In *City of Modesto*, *supra*, 34 Cal.App.3d 504, Modesto, a charter city, sought to compel irrigation districts—state agencies that distribute and sell electrical energy—to collect utility taxes owed by the service user. The irrigation districts conceded the utility users' tax was a "valid exercise of a chartered city's power to tax for revenue purposes." (*Id.* at p. 506.) But much like the universities here, the irrigation districts argued "that they cannot be compelled to collect the city's tax because the ordinance, to the extent that it applies to them, impinges on the state's sovereignty over local entities; they assert that the collection requirement of the city ordinance is a regulation and that this regulation, if extended to state agencies, contravenes the almost universal rule throughout this country that the activities of the state and its agencies cannot be controlled or regulated by local entities in the absence of legislative consent." (*Ibid.*)

The Court of Appeal rejected this argument. The court held, as an initial matter, that a collection requirement that affects a state agency in its "proprietary" capacity does not impinge on state

sovereignty. (*City of Modesto*, *supra*, 34 Cal.App.3d at pp. 506–507.)[7]
But the court then proceeded to "affirm the judgment for another
reason." (*Id.* at p. 508.) Recognizing that the city "has no practical
nor economical means of collecting such a tax without the cooperation
of the supplier of the utility service," the court concluded: "It is basic
that the power to tax carries with it the corollary power to use
reasonable means to effect its collection; otherwise, the power to
impose a tax is meaningless. (*Ainsworth*[, *supra*,] 34 Cal.2d [at p.] 476
[211 P.2d 564].) It is also basic that if there is a conflict between the
California Constitution and a law adopted by the Legislature, the
California Constitution prevails. While irrigation districts may be
state agencies, they are nevertheless creatures of the Legislature, and
like the Legislature must submit to a constitutional mandate; the
California Constitution is the paramount authority to which even
sovereignty of the state and its agencies must yield. It follows that
the collection requirement of respondent's ordinance, though
applicable to state agencies, is a reasonable exercise of the city's
constitutional power to tax for revenue purposes." (*City of Modesto*,
at p. 508.) In so holding, the court emphasized that the irrigation
districts "are merely conduits for the collection of the city's tax; they
are not liable for the tax itself or the cost of collection; the trial court
has ordered the city to reimburse the districts for all costs incurred in

---

[7] As noted above, we do not rely on the distinction between
proprietary and governmental activities in reaching our conclusion in
this case. (See *ante*, fn. 5.)

the collection process." (*Id.* at pp. 508–509.)[8]  The same is true here, and the same result should obtain.

Our conclusion is also, as noted, consistent with high court precedent holding that the power to tax includes the power to require reasonable collection efforts from a fellow government.  In *Moe v. Salish & Kootenai Tribes* (1976) 425 U.S. 463 (*Moe*), the court adjudicated a series of disputes between the asserted taxing power of the State of Montana and the immunity claimed by an Indian tribe. As relevant here, although states have no power to regulate Indian tribes, the court upheld a state cigarette tax imposed on reservation sales to non-Indians.  The court went on to consider whether the state could require an Indian retailer on the reservation (including the tribe itself) to collect a state cigarette tax imposed on sales to non-Indians. The tribe argued "that to make the Indian retailer an 'involuntary agent' for collection of taxes owed by non-Indians is a 'gross interference with [its] freedom from state regulation.' " (*Id.* at p. 482.) But, the court recognized, "[w]ithout the simple expedient of having the retailer collect the sales tax from non-Indian purchasers, it is clear that wholesale violations of the law by the latter class will go virtually unchecked."  (*Ibid.*)  The court further explained that the "State's

---

[8]  In *City of Moreno Valley*, *supra*, 31 Cal.App.4th 24, the court relied on *City of Modesto* to hold that the city could require a municipal water district to collect and remit utility taxes.  Unlike in *City of Modesto*, however, the district in *City of Moreno Valley* did not claim that the ordinance impinged on the state's sovereignty; it argued only that no statute authorized the city to impose the collection requirements on it.  (See *City of Moreno Valley*, at p. 30.)

requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax." (*Id.* at p. 483.) This collection requirement, the court said, did not frustrate tribal self-government or run afoul of any congressional enactment. (*Ibid.*) Thus, "the State may require the Indian proprietor simply to add the tax to the sales price and thereby aid the State's collection and enforcement thereof." (*Ibid.*)[9]

Here, balancing the relevant interests of the concerned governments, we reach a similar conclusion. The municipal interests at stake are weighty. As a charter city, San Francisco has the

---

[9]    The court sounded a similar theme in *Rainier Nat. Park Co. v. Martin* (W.D.Wn. 1937) 18 F.Supp. 481, affd. *sub nom. Rainier Nat. Park Co. v. Martin* (1938) 302 U.S. 661, which we cited in *Ainsworth*. A corporation operating in a national park in the State of Washington challenged the validity of various taxes levied by the state, including a retail sales tax that the state required the corporation to collect on merchandise sold to tourists, on the grounds that it was an instrumentality of the United States and immune from taxation. (*Rainier Nat. Park, supra*, 18 F.Supp. at p. 487.) The court held that Washington did possess the authority to impose the contested taxes, and "[w]hen the state reserved the right to tax, it also reserved the right to collect or enforce the tax. The former without the latter would be an empty gesture, which is not the purpose of the reservation. If the collection or enforcement incidentally constituted a regulation of plaintiff's business, it was valid, nevertheless, if the means adopted for the collection or enforcement are reasonable. It has long been held that the imposition of the duty to collect the tax upon a person, and thus constitute such person an agent of the state, is a reasonable means for collection of the tax." (*Id.* at p. 488.)

constitutional power to raise revenue through taxes. This power is an "essential attribute of its existence" (*Ainsworth, supra*, 34 Cal.2d at p. 472), and it would be "meaningless" (*City of Modesto, supra*, 34 Cal.App.3d at p. 508) if the city was prohibited from taking reasonable steps to collect the tax. Frequently, the city will have no practical means of collecting the tax itself (see *City of Modesto*, at p. 508), and requiring consumers to self-report their tax liability would simply invite extensive fraud (see *Moe, supra*, 425 U.S. at p. 482).

The interests of the state agency tasked with collection are, by contrast, less compelling. Receiving and remitting the particular tax at issue in this case is a "minimal burden" (*Moe, supra*, 425 U.S. at p. 483), particularly where, as in *City of Modesto*, the agency tasked with collection is reimbursed by the city for all of its associated administrative costs (*City of Modesto, supra*, 34 Cal.App.3d at pp. 508–509). Neither the universities' ability to pursue their broadly defined educational mission nor their ability to construct and manage on-campus parking operations depends on whether state employees collect a parking tax or the city undertakes the expense to collect the tax itself.

For these reasons, we conclude that San Francisco's parking tax collection requirement, as applied to the state universities, does not violate principles of state sovereignty embodied in the California Constitution. The universities maintain the autonomy to manage their property as they wish, and the universities have failed to demonstrate that the minimal burden associated with collecting and remitting the parking tax poses a risk of substantial interference with their ability to carry out their governmental functions. We must, in any event, recall that it is ultimately the People of the State of California who are its "highest sovereign power." (*Oakland Paving*

*Co. v. Hilton* (1886) 69 Cal. 479, 514.) The universities exercise those powers granted to them by the People of this state, just as the charter cities exercise those powers granted to them by the People. If San Francisco's tax collection requirement offends state sovereignty, it must be because the requirement in some way offends or disadvantages the People's interests. For reasons already explained, that is not the case here.

## V.

We conclude charter cities may require state agencies to assist in the collection and remittance of municipal taxes. Levying taxes to raise revenue is an archetypal municipal affair, and a power secured by the home rule provision of the state Constitution. Requiring public parking lot operators to collect municipal taxes along with parking fees, and to remit the taxes owed, represents no more than a de minimis administrative burden on the state agencies. San Francisco's collection requirement is a valid exercise of its power, from which the universities are not immune.

We reverse the judgment of the Court of Appeal and remand for further proceedings consistent with this opinion.


**KRUGER, J.**


**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**BAKER, J.**[*]

---

[*] Associate Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** City and County of San Francisco v. Regents of University of California
_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding**
**Review Granted** XXX 11 Cal.App.5th 1107
**Rehearing Granted**

_____

**Opinion No.** S242835
**Date Filed:** June 20, 2019
_____

**Court:** Superior
**County:** San Francisco
**Judge:** Ernest H. Goldsmith and Marla J. Miller

_____

**Counsel:**

Dennis J. Herrera, City Attorney, Jean H. Alexander, Chief Tax Attorney, Christine Van Aken, Chief of Appellate Litigation, and Peter J. Keith, Deputy City Attorney, for Plaintiff and Appellant.

Colantuono, Highsmith & Whatley, Michael G. Colantuono and Aleks R. Giragosian for League of California Cities as Amicus Curiae on behalf of Plaintiff and Appellant.

Jarvis, Fay, Doporto & Gibson, Jarvis, Fay & Gibson, Benjamin P. Fay, Gabriel McWhirter; Elise Traynum; Charles F. Robinson, Karen J. Petrulakis and Margaret L. Wu for Defendant and Respondent Board of Directors of Hastings College of the Law.

Margaret L. Wu; Munger, Tolles & Olson, Bradley S. Phillips, Benjamin J. Horwich and Dila Mignouna for Defendant and Respondent The Regents of the University of California.

Kamala D. Harris and Xavier Becerra, Attorneys General, Edward C. DuMont, State Solicitor General, Janill L. Richards, Principal Deputy State Solicitor General, Gonzalo C. Martinez, Deputy State Solicitor General, Geoffrey H. Wright, Associate Deputy State Solicitor General, Paul D. Gifford, Assistant Attorney General, Joyce E. Hee, David Lew and Robert E. Asperger, Deputy Attorneys General, for Defendant and Respondent Board of Trustees of the California State University.

David A. Carrillo; Benbrook Law Group, Bradley A. Benbrook and Stephen M. Duvernay for California Constitution Center as Amicus Curiae on behalf of Defendants and Respondents.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Peter J. Keith
Deputy City Attorney
1390 Market Street, Sixth Floor
San Francisco, CA  94102
(415) 554-3908

Janill L. Richards
Principal Deputy State Solicitor General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102
(415) 510-3920